525 A.2d 1059

**CITY OF COLLEGE PARK, et al.**

**v.**

**Joseph W. COTTER III.**

**No. 148, Sept. Term, 1986.**

Court of Appeals of Maryland.

June 3, 1987.

Morris Topf (Topf, Goldstein, Handler & White, P.C., on the brief), Bethesda, for appellants.

Ronald Willoner (Willoner, Calabrese & Rosen, College Park, and V. Charles Donnelly, Hyattsville, on the brief), for appellee.

Argued Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH,* McAULIFFE and ADKINS, JJ.

COUCH, Judge.

We granted certiorari in this case to determine whether the City Council of College Park is prohibited from conducting any closed meetings under the Municipal Charter of

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

College Park and the Maryland Sunshine Law, Maryland Code (1984, 1986 Cum.Supp.), State Government §§ 10–501 —510.[1]

## I

Joseph W. Cotter III (appellee), an elected member of the City Council of College Park ("City Council" or "Council"), filed suit in the Circuit Court for Prince George's County against the Mayor and seven members of the City Council (appellants). In his complaint, he alleged that the Council held closed meetings in violation of Article 10, section 24 of the Municipal Charter of College Park ("Municipal Charter" or "Charter"), which states: "All meetings of the Mayor and Council herein provided for, shall be open to the citizens of the city."[2] Appellee requested a writ of mandamus "requiring said officials of the City of College Park and their agents to hold open, public meetings and enjoining them from locking the doors of the Municipal Center during meetings of the Mayor and Council."[3]

---

**1.** The litigants in this case do not ask us to apply the provisions of the "older" sunshine laws. *See* Md.Code (1957, 1987 Repl.Vol.), Art. 23A, § 8 (municipalities); Art. 25, § 5 (counties). *See also* Art. 24, §§ 4–201—216 (St. Mary's County Open Meetings Act); § 5–101 (Charles County Freedom of Information Act); Art. 41, § 1–205 (Executive Branch).

**2.** In support of this contention, the appellee offers the affidavit of Walter L. Green, one of two original drafters of the Municipal Charter of College Park. In his statement, Mr. Green states:

"4. That in drafting the language stating 'All meetings of the Mayor and Council herein provided for, shall be open to the citizens of the city' we discussed the meaning of this language and drafted it on the basis that we wanted for College Park the open meeting concept of the 'New England Town Meeting.'"

"5. That it was our intent that *every* meeting of the Mayor and Council shall be open to the citizens, without exception."

**3.** The complaint also requested an "order directing the Mayor and Council to give timely notice of all meetings by placing said notice in the City *Municipal Scene*, the local newspapers, on the city cable station channel, and on the public bulletin board in the Municipal Center." The record does not show any action by the trial court on

According to appellee, the Mayor and City Council have held at least twenty closed meetings in the two years preceding the instant suit. On many occasions, appellee contends, these meetings were held without prior notice to the public; when citizens did attend, they were removed from the meeting hall. Appellee notes that since he took office in December of 1985, four such closed meetings have been held. Appellee asserts that he has registered a protest with the Mayor and City Council and has excluded himself from three of these meetings on the ground that to attend them would violate his oath to uphold the Municipal Charter.

Answering the complaint,[4] the appellants do not dispute that closed meetings have been held on certain occasions during a three year period beginning in 1983.[5] They argue, however, that these closed sessions, which have been "held to consult with City staff, especially the City Attorney, on very limited issues,"[6] are permitted by the Maryland Sunshine Law ("Sunshine Law" or "the Act").[7] They also contend that the Municipal Charter does not present a bar to such meetings. In their view, the Charter does not "in any way preclude executive sessions for the purpose of

the notice issue, nor any objection concerning this inaction. We therefore deem the appellee's request for notice to be waived.

4. In response to appellee's complaint, the appellants filed a Motion to Dismiss or for Summary Judgment. Subsequently, appellee filed his own Motion for Summary Judgment.

5. According to appellants, closed meetings have been held since the inception of the City of College Park.

6. Elaborating, appellants state that the City Council has adjourned to closed session when it was in the public's interest to privately confer with City personnel, including legal counsel, regarding actual or potential litigation and extremely sensitive personnel matters.

7. Appellants emphasize that the City Council has entered into closed session only for the purposes permitted by the Maryland Sunshine Law and its predecessor. *See* Md.Code (1984, 1986 Cum.Supp.), State Government § 10–508. Furthermore, the Council has never adopted any ordinance or resolution or engaged in any legislative or quasi-legislative function during these closed meetings.

consultation with counsel or to discuss other issues which must properly be considered out of the public view."

After a hearing, the trial court enjoined the Mayor and City council from conducting any closed sessions or meetings as long as Article 10, section 24 of the Municipal Charter remained in force. The court reasoned:

"[U]nder the plain language of the [Maryland Sunshine Law] Section 10–504 (1984) conflict of laws provision, since Article X, Section 24, of the City Charter of College Park is more stringent [ (i.e., allows no exception to the open meeting requirement) ], it controls and all meetings of the Mayor and Council of College Park are required to be open meetings.

. . . . .

"Where the intent of a statute is expressed in clear and unambiguous language, as it is in Article X, Section 24, of the Charter of the City of College Park, the court must carry it into effect even if the court is of the opinion that the policy of the legislation is unwise, harsh or unjust."

The court added:

"If the City of College Park no longer wishes to require all meetings of the Mayor and Council to be open, it has available the Md.Ann.Code Art. 23A (1957) provisions for amending the Charter."

The appellants appealed the lower court's decision to the Court of Special Appeals and concurrently filed a petition for writ of certiorari with this Court. Before review by the intermediate appellate court, we granted appellants' petition. We shall affirm the judgment of the circuit court.

## II

At the outset, we address appellee's contention that the instant appeal is moot. Shortly after the appellee filed his suit, the Mayor and City Council of College Park proposed an amendment to the open meeting provision in the Munici-

pal Charter.[8] As amended, Article 10, section 24 would read as follows (emphasis added):

> "All meetings of the Mayor and Council herein provided for shall be open to the citizens of the city. *Nothing contained herein shall be construed to prevent the Mayor and City Council from holding executive (closed) session from which the public is excluded, in accordance with the safeguards provided by State law, but no ordinance, resolution, rule or regulation shall be finally adopted at such an executive meeting."*

More than 1100 signatures of registered College Park voters were collected to bring the proposed amendment to a referendum vote.[9] The ballot asked voters whether they were "in favor of closed meetings of the Mayor and Council as permitted by and held in accordance with the safeguards of the State of Maryland Sunshine Act." [10] On December 9, 1986, the voters defeated the proposed charter amendment.[11]

The appellee contends the referendum vote moots the present controversy. He reasons as follows: The vote represents the public's desire for open meetings. When the Charter provision in force is read as reflecting this desire, the appellants' contention that Article 10, section 24 permits closed sessions is no longer tenable. "Since there is no longer any controversy with regard to how the voters of

---

**8.** *See* Md.Code (1957, 1987 Repl.Vol.), Art. 23A, § 13(a). Apparently, the appellee did not vote for the proposal.

**9.** *See* Md.Code (1957, 1987 Repl.Vol.), Art. 23A, § 13(g)–(h).

**10.** The ballot also contained a second question: "Are you in favor of increasing the compensation of the Mayor to forty-eight hundred dollars ($4800) per year and the compensation of each council member to thirty-six hundred dollars ($3600) per year commencing the first regular meeting of the Mayor and Council in the next calendar month following the 1987 general city election?" The voters defeated this proposal.

**11.** Twenty-four per cent of the registered voters of College Park cast a ballot in the referendum. The Charter amendment was defeated by a vote of 661 (No) to 486 (Yes).

College Park want the meetings of their Mayor and Council conducted, and the Mayor and Council are the peoples' duly elected representatives, there is no longer an existing controversy." We reject appellee's contention.

As a general rule, appellate courts do not give opinions on abstract propositions or moot questions. *See, e.g., County Commissioners of Charles County v. Secretary of Health & Mental Hygiene,* 302 Md. 566, 568, 489 A.2d 1127, 1128 (1985) (and cases cited therein). "A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Attorney General v. Anne Arundel County School Bus Contractors Association,* 286 Md. 324, 327, 407 A.2d 749, 752 (1979) (citations omitted). When a party is seeking an injunction or similar relief, it will not "issue if the acts sought to be enjoined have been discontinued or abandoned." *Id.,* 407 A.2d at 752 (citations omitted).

█ In the instant case, a controversy still exists between the opposing litigants. The referendum vote, although expressing the will of a majority of the interested voters of College Park, did not amend the Municipal Charter, thereby eliminating the controversy concerning the interpretation of the Charter provision in question. The vote did not prevent the appellants from still maintaining, which they do on appeal,[12] that Article 10, section 24 permits closed meetings. This is simply not a case where the "acts sought to be enjoined have been discontinued or abandoned." *Anne Arundel County School Bus,* 286 Md. at 327, 407 A.2d at 752. *Compare State v. Ficker,* 266 Md. 500, 507, 295 A.2d 231, 235 (1972) (offending act sought to be enjoined has been abandoned). Had the referendum vote amended the Charter to explicitly prohibit closed meetings, or to prevent the appellants from pursuing their present position, we would have a very different situation. Since an effective

---

12. *See* Appellants' Reply Brief at 3.

remedy does exist (i.e., an injunction), we conclude the present appeal is not moot.

### III

We begin our analysis with the Maryland Sunshine Law, Md.Code (1984, 1986 Cum.Supp.), State Government §§ 10–501—510, which will bring the present controversy into focus. The Maryland Sunshine Law requires that meetings of public bodies, with limited exceptions, be open to the public. *See Carroll County Education Association v. Board of Education of Carroll County,* 294 Md. 144, 147, 448 A.2d 345, 347 (1982); *Avara v. Baltimore News American Division,* 292 Md. 543, 440 A.2d 368 (1982).[13] Section 10–502 expresses the legislative policy of the statute:

"It is essential to the maintenance of a democratic society that, except in special and appropriate circumstances:

1) public business be performed in an open and public manner; and

2) citizens be advised and aware of:

(i) the performance of public officials; and

(ii) the deliberations and decisions that the making of public policy involves."

At the heart of the Act is section 10–505, which states that a public body [14] shall meet [15] in open session [16] whenev-

---

**13.** For a discussion of open meeting statutes in other jurisdictions, see Annot., 38 A.L.R.3d 1070 (1971, 1986 Supp.); 56 Am.Jur.2d *Municipal Corporations* § 161 (1971, 1986 Supp.).

**14.** "Public body" means an entity that:
 (1) consists of at least 2 individuals; and
 (2) is created by:
 (i) the Maryland Constitution;
 (ii) a State statute;
 (iii) a county charter;
 (iv) an ordinance;
 (v) a rule, resolution, or bylaw;
 (vi) an executive order of the Governor; or
 (vii) an executive order of the chief executive authority of a political subdivision of the State.

**15.** See note 15 on page 582.

**16.** See note 16 on page 582.

er that body is carrying out an advisory, legislative, or quasi-legislative function.[17] The Act does, however, allow

---

Md.Code (1984, 1986 Cum.Supp.), State Government § 10–501(g). Neither party disputes that the City Council of College Park is a "public body" within the meaning of this section.

**15.** "Meet" means to convene a quorum of a public body for the consideration or transaction of public business. Md.Code (1984, 1986 Cum.Supp.), State Government § 10–501(f). A quorum is simply a majority of the members of a public body or any different number that law requires. *Id.* at 10–501(j).

**16.** "Whenever a public body meets in open session, the general public is entitled to attend." Md.Code (1984, 1986 Cum.Supp.), State Government § 10–507(a).

**17.** "Advisory function" means the study of a matter of public concern or the making of recommendations on the matter, under a delegation of responsibility by:
(1) law;
(2) the Governor;
(3) the chief executive officer of a political subdivision of the State; or
(4) formal action by or for a public body that exercises an executive, judicial, legislative, quasi-judicial, or quasi-legislative function.
Md.Code (1984, 1986 Cum.Supp.), State Government § 10–501(b).
"Legislative function" means the process or act of:
(1) approving, disapproving, enacting, amending, or repealing a law or other measure to set public policy;
(2) approving or disapproving an appointment;
(3) proposing or ratifying a constitution or constitutional amendment; or
(4) proposing or ratifying a charter or charter amendment.
*Id.* at 10–501(e).
"Quasi-legislative function" means the process or act of:
(1) adopting, disapproving, amending, or repealing a rule, regulation, or bylaw that has the force of law, including a rule of a court;
(2) approving, disapproving, or amending a budget; or
(3) approving, disapproving, or amending a contract.
*Id.* at 10–501(i).
The Act does not apply to:
"(1) the Governor's Executive Council or any of its committees;
(2) a local government's counterpart to the Governor's Executive Council or any committee of the counterpart;
(3) a public body when it is carrying out:
(i) an executive function;
(ii) a judicial function; or
(iii) a quasi-judicial function; or

closed meetings to take place in limited circumstances. *See* Md.Code (1984, 1986 Cum.Supp.), State Government § 10-508(a).[18] For example, a public body may meet in closed session or adjourn an open session to a closed session to consult with counsel, *id.* at § 10-508(a)(7), or to protect the privacy and reputation of individuals with respect to a matter that is not related to public business. *Id.* at § 10-508(a)(2). A public body that meets in closed session

---

(4) a chance encounter, social gathering, or other occasion that is not intended to circumvent this subtitle."
*Id.* at 10-503.

18. "A public body may meet in closed session or adjourn an open session to a closed session only to:
(1) discuss:
 (i) the appointment, employment, assignment, promotion, discipline, demotion, compensation, removal, or resignation of appointees, employees, or officials over whom it has jurisdiction; or
 (ii) any other personnel matter that affects 1 or more specific individuals;
(2) protect the privacy or reputation of individuals with respect to a matter that is not related to public business;
(3) consider the acquisition of real property for a public purpose and matters directly related thereto;
(4) consider a preliminary matter that concerns the proposal for a business or industrial organization to locate in the State;
(5) consider the investment of public funds;
(6) consider the marketing of public securities;
(7) consult with counsel;
(8) consult with staff, consultants, or other individuals about pending or potential litigation;
(9) conduct collective bargaining negotiations or consider matters that relate to the negotiations;
(10) discuss public security, including:
 (i) the deployment of fire and police services and staff; and
 (ii) the development and implementation of emergency plans;
(11) prepare, administer, or grade a scholastic, licensing, or qualifying examination;
(12) conduct an investigative proceeding on actual or possible criminal conduct;
(13) comply with a specific constitutional, statutory, or judicially imposed requirement that prevents public disclosures about a particular proceeding or matter; or
(14) satisfy an exceptional reason that, by two-thirds vote of the members of the public body who are present at the session, the public body finds to be so compelling that the reason overrides the general public policy in favor of open sessions."

may not discuss or act on a matter not explicitly permitted under section 10–508(a). *Id.* at 10–508(b).

Before meeting in an open session, a public body must give reasonable advance notice to the public of the upcoming session. *Id.* at 10–506(a). *See City of New Carrollton v. Rogers,* 287 Md. 56, 410 A.2d 1070 (1980). Whenever reasonable, the requisite notice must be in writing, and include the date, time and place of the session. Md.Code (1984, 1986 Cum.Supp.), State Government § 10–506(b).[19] The Act also requires the public body to maintain minutes of its session, reflecting each item that the public body considered, the action taken on each item, together with any recorded votes. *Id.* at 10–509(b)–(c). These minutes, which are to be prepared as soon as practicable after the body meets, are public records and shall be open for public inspection. *Id.* at 10–509(d).[20]

---

**19.** "A public body may give notice in one of the following ways:

 (1) if the public body is a unit of the State government, by publication in the Maryland Register;

 (2) by delivery to representatives of the news media who regularly report on sessions of the public body or the activities of the government of which the public body is a part;

 (3) if the public body previously has given public notice that this method will be used, by posting or depositing the notice at a convenient public location at or near the place of the session; or

 (4) by any other reasonable method."

Md.Code (1984, 1986 Cum.Supp.), State Government § 10–506(c).

**20.** Section 10–509(c)(2) states:

"If a public body meets in closed session, the minutes for its next open session shall include:

 (i) a statement of the time, place, and purpose of the closed session;

 (ii) a record of the vote of each member as to closing the session; and

 (iii) a citation of the authority under this subtitle for closing the session."

However, if a public body meets in an authorized closed session and inspection of the minutes would frustrate the purposes served by the closed session, the minutes are not open for public inspection. *Id.* at 10–509(c)(2).

In *City of New Carrollton v. Rogers,* Chief Judge Murphy for this Court summarized the impact of the Sunshine Law then in force. His observations are applicable to the current Act:

> "While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well to all deliberations which precede the actual legislative act or decision, unless authorized by [§ 10–508] to be closed to the public. The Act makes no distinction between formal and informal meetings of the public body; it simply covers all meetings at which a quorum of the constituent membership of the public body is convened 'for the purpose of considering or transacting public business.' [§ 10–501(f)]. It is, therefore, the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business."

*Id.* at 72, 410 A.2d at 1078–79.[21]

## IV

 In the instant case, both parties focus on section 10–504 of the Act, entitled Conflict of Laws, which reads as follows (emphasis added):

---

**21.** The Act also contains an enforcement provision, Md.Code (1984, 1986 Cum.Supp.), State Government § 10–510, which empowers a trial court in appropriate circumstances to require the public body to comply with the statute, and to void the action of the public body. *Id.* at 10–510(c). In an action under section 10–510, it is presumed that the public body has not violated any provision of the Act, and the complainant has the burden of proving the violation. *Id.* at 10–510(d).

"Whenever this subtitle and another law that relates to meetings of public bodies conflict, this subtitle applies *unless the other law is more stringent.*"

This provision establishes that, although the Maryland Sunshine Law is the touchstone by which public bodies are to conduct their meetings, the statute is not exclusive in its application. The statute only outlines the *minimum* requirements for conducting open meetings. *Cf. Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393, 396 A.2d 1080, 1086 (1979) (Md.Code (1957, 1987 Repl.Vol.), Art. 23A, implementing Article XI-E, § 3 of the Maryland Constitution, only establishes minimum requirements regarding municipal affairs; municipalities are free to provide additional standards and safeguards in harmony with concurrent state legislation). It does not supersede legislative enactments designed to bring more openness to public meetings. *Cf. Tahoe Regional Planning Agency v. McKay*, 590 F.Supp. 1071, 1072 (D.Nev.1984), *aff'd*, 769 F.2d 534 (9th Cir.1985) (The Tahoe Regional Planning Compact, a congressionally ratified interstate compact, intended that the sunshine law of the State granting greater public access to meetings of local governments is the law which should control the Compact's governing agency, Tahoe Regional Planning Agency). Stated differently, section 10–504 permits expansion upon the guarantees of the statute, thereby limiting or eliminating the circumstances enumerated in section 10–508 in which closed meetings may be held.[22] As so construed,

---

**22.** Several states have enacted a provision similar to section 10–504. In California:

"*Allowance of greater access to meetings than minimal standards in this chapter*

"Notwithstanding any other provision of law, legislative bodies of local agencies may impose requirements upon themselves which allow greater access to their meetings than prescribed by the minimal standards set forth in this chapter. In addition thereto, an elected legislative body of a local agency may impose such requirements on those appointed legislative bodies of the local agency of which all or a majority of the members are appointed by or under the authority of the elected legislative body."

Cal.Gov't Code § 54953.7 (West 1983).

section 10–504 is consistent with, and best effectuates, the legislature's commitment to promoting public access to the affairs of state.

Appellee argues, and the trial court held, that the Municipal Charter provision in question (Article 10, sec. 24) is a "more stringent" law within the contemplation of section 10–504. According to the trial court, while section 10–508 "allows public bodies to hold closed meetings under certain conditions, the City Charter of College Park is more restrictive and allows no exceptions to the open meeting requirement." As a more stringent law, "it controls and all meetings of the Mayor and Council of College Park are required to be open meetings."

The issue presented, then, is one of statutory construction. The fundamental task, in such a case, is to discern the objective, goal or purpose of the legislation. *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 512, 525 A.2d 628 (1987). In our "efforts to discover purpose, aim, or policy we look at the words of the statute ... because

---

In Illinois:

*"Minimum requirements for home rule units*

"§ 6. The provisions of this Act constitute minimum requirements for home rule units; any home rule unit may enact an ordinance prescribing more stringent requirements binding upon itself which would serve to give further notice to the public and facilitate public access to meetings."

Ill.Ann.Stat. ch. 102, § 46 (Smith-Hurd 1986).

In New York:

*"Construction with other laws*

"1. Any provision of a charter, administrative code, local law, ordinance, or rule or regulation affecting a public body which is more restrictive with respect to public access than this article shall be deemed superseded hereby to the extent that such provision is more restrictive than this article.

"2. Any provision of general, special or local law or charter, administrative code, ordinance, or rule or regulation less restrictive with respect to public access than this article shall not be deemed superseded hereby.

"3. Notwithstanding any provision of this article to the contrary, a public body may adopt provisions less restrictive with respect to public access than this article."

N.Y.Pub.Off. Law § 110 (Consol.1986). *See* 1977 Op. Att'y Gen. 299 (October 18) (informal).

what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal." *Id.*, at 513, 525 A.2d 628. We also may consider "other material that fairly bears on the fundamental issue of legislative purpose or goal" so that we may read the language of the legislation in the context within which it was written. *Id.* at 515, 525 A.2d 628.

In the instant case, the language of Article 10, section 24 of the Municipal Charter is clear.[23] It is a flat prohibition against closed meetings [24] in the City of College Park. That language is totally consistent with the apparent intent of the provision, which is to mandate open meetings of the Mayor and Council. *See* note 2, *supra. And see* notes 8–11, *supra,* and accompanying text. It is also consistent with the section 10–504 conflict of laws provision, because the Charter provision is a permissible expansion upon the guarantees embodied in the Maryland Sunshine Act.[25]

---

**23.** The term "shall" in Article 10, section 24 is presumed to be mandatory, *Moss v. Director, Patuxent Inst.*, 279 Md. 561, 564–65, 369 A.2d 1011, 1013 (1977), and "denotes an imperative obligation inconsistent with the exercise of discretion." *Bright v. Unsatisfied Claim & Judgment Fund Board,* 275 Md. 165, 169, 338 A.2d 248, 251 (1975) (citations omitted). *See In re James S.,* 286 Md. 702, 410 A.2d 586 (1980).

**24.** Neither party contends that the term "meetings" in Article 10, section 24 is more or less stringent than the definition of "meet" in the Sunshine Law. Therefore, the former term means "to convene a quorum of a public body for the consideration or transaction of public business." Md.Code (1984, 1986 Cum.Supp.), State Government § 10–501(f). *See Wilson v. Board of Supervisors of Elections,* 273 Md. 296, 328 A.2d 305 (1974).

**25.** In the instant case, although Article 10, section 24 of the Charter prevails over the open meeting exceptions in section 10–508, the Sunshine Law is not inoperative *in toto.* For instance, the City Council must give reasonable notice of upcoming sessions, Md. Code (1984, 1986 Cum.Supp.), State Government § 10–506, and prepare written minutes of its meetings, id. at § 10–509. The Council is also subject to the enforcement provisions in section 10–510. When a "more stringent" law is in force, it supersedes the application of the Maryland Sunshine Law under section 10–504 *only* to the extent the more stringent law exceeds the safeguards of the Act.

In an effort to undermine the trial court's reliance on the conflict of laws provision (section 10–504), appellants argue that the Charter is *not* more stringent than the Sunshine Law. Appellants reason as follows:

"While the new Sunshine Act provides that all meetings, except where specifically provided, are to be open to the public ..., the City Charter states that meetings need be open only to 'the citizens of the city,' which is a more limited group than the 'general public' referred to in the new Sunshine Act."

Since the Charter provides for less public participation than the Sunshine Law, appellants contend, section 10–504 is inapplicable and the Sunshine Law and its enumerated exceptions should take precedence over the Charter.

 We think the appellants read the phrase "citizens of the city" too narrowly.[26] The " 'meaning of the plainest language' is controlled by the context in which it appears." *Kaczorowski*, 309 Md. at 514, 525 A.2d 628 (quoting *Guardian Life Ins. Co. of America v. Ins. Comm'r*, 293 Md. 629, 642, 446 A.2d 1140, 1147 (1982)). As we have already noted, the context of the words "citizens of the city" is a charter provision designed to assure completely open meetings. In any event, if one of the proposed interpretations would render an enactment valid, while another would render it invalid or ineffective, the court will construe the enactment to be valid whenever feasible. *In re Criminal Investigation No. 1–162*, 307 Md. 674, 685, 516 A.2d 976, 982 (1986); *Pickett v. Prince George's County*, 291 Md. 648, 661, 436 A.2d 449, 456 (1981). Relying on this rule, we conclude that the phrase noted above is consistent with, and not any narrower than, the term "general public" as used in section 10–507(a) of the Sunshine Law. *See supra* note 16.

---

**26.** The appellants do not cite any legislative history or case law to support their reading of this phrase.

## V

■ Appellants advance two additional arguments in support of their position. First, appellants suggest that we read the Municipal Charter to incorporate the circumstances enumerated in section 10–508 in which closed meetings may be held. *See supra* note 18. We decline to accept the appellants' invitation to do so. Their argument ignores the impact of the Act's conflict of laws provision (section 10–504). Furthermore, appellants would have us read into the Municipal Charter something which is plainly not permitted by its language, and which is completely inconsistent with the purpose of the Charter.[27]

■ As a fallback position, appellants argue that we should at least recognize an exception in the Municipal Charter for closed meetings between the City Council and its attorney. According to appellants, the trial court's broad construction of the Charter provision will cripple the City Council's ability to consult with its attorney, thereby emasculating the attorney-client privilege. They reason as follows:

"Settlement and avoidance of litigation are particularly sensitive activities, whose conduct would be greatly confounded, often made impossible, by undiscriminating insistence on open lawyer-client conferences. In settlement advice, the attorney's professional task is to provide his client a frank appraisal of strength and weakness, gains and risks, hopes and fears. If the public's 'right to know'

---

27. In support of their incorporation argument, the appellants also rely on Article XVII of the Municipal Charter, which states:
 "Where no provision is made by this Charter or the Code of Public Laws of Prince George's County for a situation which is provided for by the Annotated Code of Maryland for the State, the provisions pertaining thereto in the latter code are incorporated by reference herein for application in the City of College Park."
 Appellants' reliance on this Article is misplaced. This provision requires the incorporation of State law standards in the Municipal Charter *only* when the charter and county law are silent on a given area of the law. In the instant case, however, the Charter is not silent on the subject of closed meetings. Quite to the contrary, Article 10, section 24 is directly on point.

compelled admission of an audience, the ringside seats would be occupied by the government's adversary, delighted to capitalize on every revelation of weakness." For the reasons set forth below, we reject this contention.

■ The attorney-client privilege, deeply rooted in common law, is now codified in Md.Code (1984 Repl.Vol., 1986 Cum.Supp.), Courts and Judicial Proceedings § 9–108 ("A person may not be compelled to testify in violation of the attorney-client privilege."). The privilege is:

"a rule of evidence that forever bars disclosure, without the consent of the client, of all communications that pass in confidence between the client and his attorney during the course of professional employment or as an incident of professional intercourse between them."

*State v. Pratt,* 284 Md. 516, 519, 398 A.2d 421, 423 (1979); *Harrison v. State,* 276 Md. 122, 135, 345 A.2d 830, 838 (1975). The privilege is based on the public policy of encouraging individuals needing legal assistance to disclose information freely to their attorneys without concern that such information will be revealed. *Pratt,* 284 Md. at 520, 398 A.2d at 423; *Harrison,* 276 Md. at 135, 345 A.2d at 838. A client may waive his right to confidentiality, either expressly or implicitly, but the authority to waive the privilege belongs to the client alone. *Pratt,* 284 Md. at 521, 398 A.2d at 424.

The Maryland Sunshine Law recognizes the attorney-client privilege. Section 10–508 states in part that a public body may meet in closed session or adjourn an open session to a closed session to "consult with counsel," Md.Code (1984, 1986 Cum.Supp.), State Government § 10–508(a)(7), or to "consult with staff, consultants, or other individuals about pending or potential litigation." *Id.* at § 10–508(a)(8). But as we have construed section 10–504, the conflict of laws provision, a jurisdiction such as College Park is authorized to eliminate this exception to the open meeting requirement. Section 10–504 provides legislative authorization for the City of College Park to waive the attorney-client privilege between the governing public body (the City Coun-

cil) and its attorney. *Cf. Smith County Education Association v. Anderson,* 676 S.W.2d 328, 333 (Tenn.1984). That the General Assembly has the authority to take such action, at least outside the criminal context, is not disputed. *Cf. Bremer v. State,* 18 Md.App. 291, 334, 307 A.2d 503, 529, *cert. denied,* 269 Md. 755 (1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974) (The privilege of communication between patient and psychiatrist "exists by legislative grant, and ordinarily the legislature may provide the conditions under which it is applicable.") (citations omitted).

In support of their argument, appellants rely on a number of judicial decisions that have fashioned an exception in their open meeting statutes for private attorney-client discussions, even though the statutes do not explicitly contain such an exception. *See, e.g., Tahoe Regional Planning Agency v. McKay,* 590 F.Supp. 1071 (D.Nev.1984), *aff'd,* 769 F.2d 534 (9th Cir.1985); *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors,* 263 Cal.App.2d 41, 69 Cal.Rptr. 480 (1968); *Minneapolis Star & Tribune Co. v. Housing & Redevelopment Authority,* 310 Minn. 313, 251 N.W.2d 620 (1976).[28] In general, these cases have held that the State legislature did not intend to repeal the privilege when enacting the open meeting law.

These cases, however, do not control the present circumstances. First, we are not concerned here with establishing an attorney-client exception in the Maryland Sunshine Law; the General Assembly has already recognized this exception in section 10–508(a)(7)–(8). Second, and more significantly, when these cases were decided, none of the open meeting statutes contained a conflict of laws provision similar to section 10–504 reflecting the State legislature's intention to

---

**28.** *But see Laman v. McCord,* 245 Ark. 401, 432 S.W.2d 753 (1968) (refusing to imply exception); *Neu v. Miami Herald Pub. Co.,* 462 So.2d 821 (Fla.1985) (superseded by statute as stated in *City of Melbourne v. A.T.S. Melbourne Inc.,* 475 So.2d 270 (Fla.Dist.Ct.App.1985)) (same).

provide a given jurisdiction with the authority to afford the public greater access to meetings.[29]

---

**29.** In 1981, the California legislature enacted its own version of section 10–504. *See supra* note 22. Three years later, the State also amended its open meeting law to explicitly allow closed meetings between a legislative body and its attorney:

*"Pending litigation; closed session; notice; memorandum*

"Nothing in this chapter shall be construed to prevent a legislative body of a local agency, based on advice of its legal counsel, from holding a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation.

"For purposes of this section, litigation shall be considered pending when any of the following circumstances exist:

(a) An adjudicatory proceeding before a court, administrative body exercising its adjudicatory authority, hearing officer, or arbitrator to which the local agency is a party, has been initiated formally.

(b)(1) A point has been reached where, in the opinion of the legislative body of the local agency on the advice of its legal counsel, based on existing facts and circumstances, there is a significant exposure to litigation against the local agency; or

(2) Based on existing facts and circumstances, the legislative body of the local agency is meeting only to decide whether a closed session is authorized pursuant to paragraph (1) of this subdivision.

(c) Based on existing facts and circumstances, the legislative body of the local agency has decided to initiate or is deciding whether to initiate litigation.

"Prior to holding a closed session pursuant to this section, the legislative body of the local agency shall state publicly to which subdivision it is pursuant. If the session is closed pursuant to subdivision (a), the body shall state the title of or otherwise specifically identify the litigation to be discussed, unless the body states that to do so would jeopardize the agency's ability to effectuate service of process upon one or more unserved parties, or that to do so would jeopardize its ability to conclude existing settlement negotiations to its advantage.

"The legal counsel of the legislative body of the local agency shall prepare and submit to the body a memorandum stating the specific reasons and legal authority for the closed session. If the closed session is pursuant to subdivision (a), the memorandum shall include the title of the litigation. If the closed session is pursuant to subdivision (b) or (c), the memorandum shall include the existing facts and circumstances on which it is based. The legal counsel shall submit the memorandum to the body prior to the closed session if feasible, and in any case no later than one week after the closed session. The memorandum shall be exempt from disclosure pursuant to Section 6254.1.

In reaching our conclusion, we do not belittle the arguments advanced by the appellants that public discussions between the City Council and its attorney may be detrimental to the public's interest.[30] On the other hand, we also acknowledge concerns that weigh in favor of holding such discussions in public. For example, "to allow the Council to go into executive session at any time upon the pretext of consulting the City Attorney about legal matters, might readily open the door to repeated and undetectable evasions" of the Sunshine Law. *Laman v. McCord*, 245 Ark. 401, 406, 432 S.W.2d 753, 756 (1968). *See Sacramento Newspaper Guild*, 263 Cal.App.2d at 58; 69 Cal.Rptr. at 492; *Minneapolis Star*, 310 Minn. at 321, 246 S.W.2d at 454. In any event, the General Assembly has determined that these considerations are to be debated and resolved in the first instance by the voters of College Park. The voters have indicated their preference in Article 10, section 24 of the Municipal Charter, and we must effectuate that clear choice.

It may have been unwise for the General Assembly to allow a jurisdiction to open consultations between the City Council and its attorney; and indeed it may have been unwise for the City of College Park to have taken such a step. We do not express an opinion on either of these propositions.[31] It is simply not our role to sit in judgment

---

"For purposes of this section, "litigation" includes any adjudicatory proceeding, including eminent domain, before a court, administrative body exercising its adjudicatory authority, hearing officer, or arbitrator."
Cal. Gov't Code § 54956.9 (West 1986).

**30.** For a discussion of these policy concerns, *see Sacramento Newspaper Guild*, 263 Cal.App.2d at 55–7, 69 Cal.Rptr. at 490–91.

**31.** If in hindsight the City of College Park wishes to permit closed meetings between the City Council and its attorney, it may amend the Municipal Charter. Md. Const. art. XI–E, § 4; Md.Code (1957, 1987 Repl.Vol.) Art. 23A, §§ 11–18. For example, the voters may wish to allow closed meetings solely when litigation is being discussed between the City Council and the attorney, and an open meeting may

on the wisdom of the legislature or the voters of College Park. This Court deals with the construction and constitutionality of legislative determinations, not their wisdom. *State v. Wyand,* 304 Md. 721, 726, 501 A.2d 43, 45 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986). *See Taylor v. Department of Employment & Training,* 308 Md. 468, 474, 520 A.2d 379, 382 (1987).

We therefore conclude that the City Council of College Park is prohibited from conducting any closed meetings under Article 10, section 24 of the Municipal Charter.[32]

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.

ELDRIDGE, Judge, dissenting:

The majority holds that the open meetings provision of the Municipal Charter of College Park is a more stringent law than the Maryland Open Meetings Act, Maryland Code (1984, 1986 Cum.Supp.) §§ 10–501 through 10–510 of the State Government Article, and that, therefore, the Charter provision governs meetings of the College Park City Council. Under the Court's holding, the City Council of College Park cannot privately meet with its attorney to discuss pending or potential litigation. Nor can the Council meet privately to discuss sensitive personnel issues. Instead, the majority requires the City Council of College Park to discuss these matters only in open public sessions. Because I disagree with the majority's view of the College Park

---

have an adverse impact on the City's litigation position. *See Doherty v. School Comm. of Boston,* 386 Mass. 643, 436 N.E.2d 1223 (1982).

**32.** Of course, the Charter provision only speaks in terms of *"meetings,"* which is defined as the convening of a "quorum of a public body for the consideration or transaction of public business." *See supra* note 24. It follows from this definition that nothing prohibits the City Attorney from meeting in closed session with less than a quorum of the Council members. Nor is a quorum of the Council foreclosed from convening in private when not considering or transacting public business. *See New Carrollton,* 287 Md. at 72, 410 A.2d at 1078–79.

Charter and its relationship to the Maryland Open Meetings Act, I dissent.

The resolution of the dispute in this case depends upon the application of § 10–504 of the Maryland Open Meetings Act which provides:

"Whenever this subtitle and another law that relates to meetings of public bodies conflict, this subtitle applies unless the other law is more stringent."

Therefore, it must first be determined that a conflict exists between the College Park Charter and the Maryland Open Meetings Act. If there is a conflict, § 10–504 directs us to apply the "more stringent" law.

It is undisputed that a conflict, within the meaning of § 10–504, exists between the Charter and the State Act. Article 10, § 24, of the Charter provides: "All meetings of the Mayor and Council herein provided for, shall be open to the citizens of the city." Conversely the State Act permits sessions to be closed to the public in very limited circumstances, § 10–508. Section 10–507 of the State Act, however, requires that most meetings be open to the public generally, without any limitation based on citizenship or any other connection with a particular jurisdiction or geographical area. Consequently, under the plain language of the enactments, there is a conflict in two respects. The issue, then, is which law is more stringent and therefore controlling.

Section 10–504 of the statewide law does not define "more stringent." Nevertheless, the policy of the State Act is "that, except in special and appropriate circumstances [,] ... public business be performed in an open and public manner...." § 10–502. *See Carroll Co. Educ. Ass'n v. Bd. of Educ.*, 294 Md. 144, 147, 448 A.2d 345 (1982); *Avara v. Baltimore News American*, 292 Md. 543, 545, 440 A.2d 368 (1982). Consequently, when the State Act and a local open-meeting provision conflict, the policy behind the State

Act is furthered only when the more stringent provision, *i.e.,* the one allowing greater public access, applies.[1]

Moreover, in determining whether the Charter or the Maryland Open Meetings Act allows greater public access, we must compare the entire State Act with the entire comparable provision in the Charter. This is made clear by § 10–504 of the state statute which provides that when "this *subtitle*" and "another *law*" conflict, "this *subtitle* applies unless the other *law* is more stringent." (Emphasis added). *See Tahoe Regional Planning Agency v. McKay,* 590 F.Supp. 1071 (D.Nev.1984), *aff'd* 769 F.2d 534 (9th Cir.1985) (in order to determine which of two state open meetings acts imposed "greater requirements," the court examined all parts of the acts, including closed meeting and record keeping provisions).

The majority initially compares the provisions in the Charter and the State Act relating to the permissibility of closed meetings. The College Park Charter, as the majority correctly points out, flatly prohibits closed meetings, while the State statute allows closed meetings in narrowly drawn circumstances. As a result of this comparison, the majority concludes that the Charter is less restrictive of public access and is therefore more stringent under § 10–504. I would agree with this conclusion if there were no limitation

---

**1.** Three other states also have express conflict of laws provisions in their open meetings statutes. The statutory language in each of these states indicates that municipalities may enact provisions providing greater public access, and that such local provisions will prevail over state law. Cal. Gov't Code § 54953.7 (West 1983) ("legislative bodies of local agencies may impose requirements upon themselves which allow greater access to their meetings than prescribed by the minimal standards set forth in this chapter"); Ill.Ann.Stat.Ch. 102 § 46 (Smith-Hurd Supp.1986) ("any home rule unit may enact an ordinance prescribing more stringent requirements binding upon itself which would serve to ... facilitate public access to meetings"); N.Y.Pub.Off. Law § 110 (Consol.Supp.1986) ("Any provision of a charter ... which is more restrictive with respect to public access than this article shall be deemed superseded here.... Any provision of ... [a] charter ... less restrictive with respect to public access than this article shall not be deemed superseded hereby").

in the Charter concerning who may attend a council meeting.

As previously pointed out, the State Open Meetings Act requires meetings to be open to the "general public" (§ 10–507(a)) whereas the Charter merely requires meetings to be open to the "citizens of the city." The majority, however, concludes that neither the Charter nor the State Act is more stringent than the other in this respect because, in the majority's view, "citizens of the city" "is consistent with, and not any narrower than, the term 'general public' as used in section 10–507(a)...." This construction is incompatible with the plain language used and with prior opinions of this Court.

The provision in § 10–507(a) of the State Act, that "the general public is entitled to attend" meetings of a public body, and the provision in the Charter that meetings are "open to citizens of the city," lack ambiguity in the present context. The meaning of "public" is "relating to or affecting the people" or "relating to the international community or to mankind in general." Webster's Third New International Dictionary 1836 (1981).[2] Thus the State Act requires that meetings be open to persons generally, without any geographical or jurisdictional limitation. The phrase "citizens of the city," however, given its broadest meaning, refers to the inhabitants or residents or domiciliaries of College Park. *See Crosse v. Board of Elections*, 243 Md. 555, 559–560, 221 A.2d 431 (1966); *Risewick v. Davis*, 19 Md. 82, 93 (1862). If the framers of the College Park Charter had intended meetings to be open to the "general public," they would have said so, as did the framers of

---

2. *See, e.g., Pub. Ser. Commn. v. P., B. & W. R.R. Co.*, 155 Md. 104, 120–121, 141 A. 509 (1928); *State v. Christine*, 239 La. 259, 118 So.2d 403, 405 (1959); *People v. Powell*, 280 Mich. 699, 274 N.W. 372, 373 (1937); *Hiner v. Wenger*, 197 Va. 869, 91 S.E.2d 637, 641 (1956); *Peacock v. Retail Credit Company*, 302 F.Supp. 418, 423 (N.D.Ga.1969), *aff'd* 429 F.2d 31 (5th Cir.1970).

numerous other charters.[3] Instead, the framers of the College Park Charter deliberately chose to limit meetings to "citizens of the city," and we are not free to ignore the limitation.

To bolster its conclusion that "citizens of the city" means "general public," the majority invokes the principle of statutory construction that, if there are two constructions of a provision which can reasonably be made, a court will avoid the construction that renders the provision invalid or which would involve a decision as to its validity. *See, e.g., Heileman Brewing v. Stroh Brewery,* 308 Md. 746, 763–764, 521 A.2d 1225 (1987); *Davis v. State,* 294 Md. 370, 377, 451 A.2d 107, 111 (1982); *Pickett v. Prince George's County,* 291 Md. 648, 661, 436 A.2d 449 (1981); *Moberly v. Herbold-sheimer,* 276 Md. 211, 217, 345 A.2d 855 (1975); *Prince Geo's Co. v. Chillum-Adelphi,* 275 Md. 374, 383, 340 A.2d 265 (1975); *District Land v. Wash. S.S.C.,* 266 Md. 301, 311–312, 292 A.2d 695 (1972). The majority's reliance upon this principle is entirely misplaced. Under the principle invoked by the majority, the construction which avoids a holding that the provision is invalid "must be reasonable; it must be permitted by the statutory language." *Heileman Brewing v. Stroh Brewery, supra,* 308 Md. at 764, 521 A.2d 1225. As previously discussed, the language "citizens of the city" is not reasonably susceptible to the construction embraced by the majority. Moreover, I see no reason to adopt a strained construction of a local provision in order to save it from an express preemption clause in or a conflict with a state statute. *Cf. Montgomery County v. Atlantic*

---

3. All of the charters I have examined provide that meetings shall be "open to the public," although many provide in addition that residents of the town be given a reasonable opportunity to be heard. *See, e.g.,* the Charters of Berwyn Heights § 304 (1978); Bladensburg § 3–10 (1965); Brentwood § 303.0 (1977); Cheverly Art. IV § C–13 (1978); Cottage City § 9 (1982); District Heights § 7 (1962); Glenarden § 6 (1976); Greenbelt § 5 (1984); Landover Hills § 304 (1980); Riverdale § 63–14.14 (1975); University Park § 304 (1980). *See also* Charter for Prince George's County, Maryland, § 316 (1983). I am not aware of any charter other than the College Park charter that opens its meetings only to "citizens of the city."

*Guns, Inc.,* 302 Md. 540, 489 A.2d 1114 (1985); *Rockville Grosvenor Inc. v. Mont. Co.,* 289 Md. 74, 422 A.2d 353 (1980). To do so would circumvent the intent of the General Assembly.

As earlier mentioned, under the majority's construction of the College Park Charter, the Mayor and City Council of College Park may not meet privately with the municipal attorney to discuss pending litigation. Similarly, they may not meet privately to discuss sensitive personnel issues. This is unworkable and impractical. No attorney and client team could effectively plan litigation strategy when its discussions are open to its adversaries, yet this is the result required by the majority. The majority opinion cannot be reconciled with the longstanding principle that courts should avoid constructions which are absurd, unreasonable, illogical, or inconsistent with common sense. *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 512, 525 A.2d 628 (1987); *In re Special Investigation No. 281,* 299 Md. 181, 200, 473 A.2d 1 (1984); *Cider Barrel Mobile Home v. Eader,* 287 Md. 571, 583–584, 414 A.2d 1246 (1980); *Hoffman v. Key Fed. Sav. & Loan,* 286 Md. 28, 43, 416 A.2d 1265 (1979); *Francois v. Alberti Van & Stg. Co.,* 285 Md. 663, 670, 404 A.2d 1058 (1979); *Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464 (1978).

In summary, the College Park Charter prescribes that City Council meetings shall be "open to the citizens of the city." Under the broadest reasonable construction of the language, access to City Council meetings is limited to those who reside or are domiciled within the corporate limits of College Park. In light of this limitation, it is obvious that the Maryland Open Meetings Act is less restrictive of public access and is, therefore, more stringent under § 10–504. Consequently, the state statute should apply to meetings of the City Council. I would reverse.

Judges COLE and RODOWSKY have authorized me to state that they concur with the views expressed herein.