DATA PRACTICES: COPYRIGHT: STATE AGENCY DATA: State agency data constituting original works of authorship are protected by federal copyright law. Certain restrictions may be placed upon use of public data. Tit. 17 U.S.C. Minn. Stat. §§ 13.03, 13.37, 15.95, 16B.483, 16B.51, 16B.53.

852
(Cr. Ref. 315a)

December 4, 1995

Rodney Sando, Commissioner
Department of Natural Resources
DNR Bldg., 6th Floor
500 Lafayette Road
St. Paul, Minnesota 55155

Dear Commissioner Sando:

In your letter to Attorney General Hubert H. Humphrey III, you request an opinion of the attorney general pursuant to Minn. Stat. § 8.06 (1994) which, under 13.072, subd. 1(c) (1994) takes precedence over Department of Administration Data Practices Opinion No. 94-057, issued by the acting commissioner of administration on December 28, 1994. You present substantially the following:

## FACTS

In 1994, Stephen Boe requested access to and copies of maps and other data developed by department of natural resources (DNR) staff concerning Cass Lake muskellunge. The DNR told him that he was free to view and copy the requested data, but that his right to use the data was subject to the department's copyright under the Federal Copyright Act (FCA), 17 U.S.C. § 102(a) (1988), and that all photocopies and notes on the data would carry the department's copyright notice. The DNR further advised Mr. Boe that he could not publish or otherwise use the data for purposes other than personal ones unless he obtained a license from the department.

Mr. Boe objected and, pursuant to Minn. Stat. § 13.072, subd. 1(a) (1994), requested an opinion of the commissioner of administration. Acting commissioner of administration Robert A. Schroeder opined that, under the Minnesota Government Data Practices Act (MGDPA), Minn. Stat. ch. 13 (1994), state agencies must provide access to government data classified as "public," and must also permit unrestricted use of that data, even for commercial purposes, absent specific statutory authority to the contrary. On that basis, the acting commissioner ruled that the DNR's position was impermissible.

You then asked us substantially the following:

## QUESTION

Under current law, may a state agency lawfully require that a person seeking to distribute or sell copies of government data enter into a license or authorization agreement governing the data's subsequent use, if that data is "public" under the Minnesota Government Data Practices Act?

## OPINION

We answer your question in the affirmative, subject to the following restrictions:

1. The data in question must come within the scope of "original works of authorship" of the State protected by the Federal Copyright Act (FCA), Title 17, U.S. Code.

2. The agency may not impose restrictions on use beyond its rights under the FCA. For example, the agency may use a license or authorization agreement to restrict or condition an individual's authority to make additional copies, to prepare derivative works based upon the copyrighted work, or to distribute copies to the public by sale or other transfer of ownership, or by rental, lease, or lending, 17 U.S.C. § 106 (1988), but may not restrict or condition "fair use" of the data for purposes such as criticism, comment, news reporting, teaching, scholarship, or research. 17 U.S.C. § 107 (1988).

3. The department may not assert copyright ownership to deny members of the public their right "to inspect and copy public government data at reasonable times and places" under Minn. Stat. § 13.03, subd. 3 (1994). To the extent the data has commercial value, was developed with a significant expenditure of public funds, and meets the other criteria in the second paragraph of Minn. Stat. § 13.03, subd. 3 (1994), the department may not use copyright ownership to recover fees in addition to the costs of making, certifying, and compiling copies in

an amount more than can be justified in relation to the actual development costs of the data, unless otherwise specifically authorized by statute.

Our basic conclusion is that, although the Minnesota Government Data Practices Act (MGDPA), Minn. Stat. ch. 13 (1994), generally does not permit state agencies to withhold access to "public" government data, it does not follow that the MGDPA prohibits state agencies from placing reasonable restrictions on the use of their "original works of authorship," consistent with the rights of a copyright owner under the Federal Copyright Act (FCA).

### Federal copyright law

The Federal Copyright Act (FCA) provides that:

> Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102(a) (1988). The purpose of the Act is set forth in the U.S. Constitution, which gives Congress the power "[t]o regulate the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const., art. I, § 8.

The coverage of the copyright law is broad. Not only does it protect creative works like novels, paintings, and pictures, but it also can cover what are sometimes called "fact works"-- works that have value because they communicate accurate factual information in useful ways. That includes "pictorial, graphic, and sculptural works" such as "maps, globes, charts, diagrams, models, and technical drawings," as well as "literary works," defined as "works expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the

material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101 (1988). Copyright protection also extends to "compilations," 17 U.S.C. § 103 (1988), which section 101 in turn defines as works "formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (1988). It is, of course, not the underlying facts themselves that are copyrightable, but rather the particular selection or arrangement chosen. Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S. Ct. 1282 (1991); see also Kidwell, Open Records Laws and Copyright, 1989 Wis. L. Rev. 1021, 1025.

Contrary to a common misperception, no application is required to secure copyright protection. Copyright protection is in place immediately and automatically when the work is created. No registration or other action in the Copyright Office of the Library of Congress is required,[1] nor is there any requirement that the work be published before it is copyrighted. At least since the 1978 amendments to the Federal Copyright Act, copyright "subsists" from the time that a work is first embodied in a tangible medium. 17 U.S.C. § 102 (1988).

Copyright vests initially in the author or authors of the work, 17 U.S.C. § 201(a) (1988), except that, in case of "works for hire," the employer or other person for whom the work was prepared is considered to be the author. 17 U.S.C. § 201(b) (1988). Subject to a number of

---

[1] The familiar copyright notice, e.g., "Copyright 1995 Jane Doe," is optional, as is copyright registration with the Copyright Office. Under the Berne Convention Implementation Act of 1988, Pub. L. 100-568, 102 Stat. 2853, failure to place a copyright notice can never cause loss of copyright. Copyright notices and registrations do help prevent defendants from claiming "innocent infringement" or making other arguments to avoid or reduce the size of infringement damages awards.

exceptions, 17 U.S.C. §§ 107-120 (1988), the owner of a copyright has the exclusive right to do

or to authorize any of the following:

(1)     to reproduce the copyrighted work in copies or phonorecords;

(2)     to prepare derivative works based upon the copyrighted work;

(3)     to distribute copies or phonorecords of the copyrighted work to the public
by sale or other transfer of ownership, or by rental, lease, or lending;

(4)     in the case of literary, musical, dramatic, and choreographic works,
pantomimes, and motion pictures and other audiovisual works, to perform the
copyrighted work publicly; and

(5)     in the case of literary, musical, dramatic, and choreographic works,
pantomimes, and pictorial, graphic, or sculptural works, including the individual
images of a motion picture or other audiovisual work, to display the copyrighted
work publicly.

17 U.S.C. § 106 (1988).

The State of Minnesota obviously generates significant amounts of "data" under state law

that would come within the scope of "original works of authorship" under federal law.  A

threshold question, then, is whether, under the FCA, a State or its agencies can be a copyright

owner with the exclusive rights set forth in section 106.

We conclude that they can.  Nothing in the FCA restricts the scope of the Act to private

parties.  The federal government is excluded, 17 U.S.C. § 105 (1988), but, as at least one court

has reasoned, "[t]he statute relating to copyrights is not restricted to private parties and there is

no reason to believe that such a restriction should be upheld.  In fact, the opposite inference is

required when only one specific governmental entity, the United States of America, is excluded

from the protection of the Act." National Conference of Bar Examiners v. Multistate Legal

Studies, Inc., 495 F. Supp. 34, 35 (N.D. Ill. 1980), aff'd, 692 F.2d 478 (7th Cir. 1982), cert.

denied, 464 U.S. 814, 104 S. Ct. 69 (1983).  The Copyright Office at the Library of Congress

also recognizes that works of state and local government officials can be copyrighted.  See also

Copyright Office Practices Compendium II § 206.03, cited in John W. Hazard, Jr., Copyright

Law in Business and Practice , para. 4.3[3] at 4-22 (1989):

> *Coyrightable government works.*  Works (other than edicts of government)[2]
> prepared by officers or employees of any government (except the U.S.
> Government) including State, local, or foreign governments, are subject to
> registration if they are otherwise copyrightable.

Hazard at 4-22 ("It is generally recognized that the works of state and local governments can be

the subject of a copyright.")  Likewise, the Copyright Remedy Clarification Act, adopted in

1990, expressly includes "any governmental or nongovernmental entity" within the scope of

those with standing to sue in federal court for copyright infringement, clearly suggesting

Congress's understanding that state and local governments can be copyright owners.  17 U.S.C.

§ 511 (1988).  See also Kidwell, Open Records Laws and Copyright, 1989 Wis. L. Rev. 1021,

1024 ("[S]tate and local governments may generally hold copyright in works they author, while

the federal government may not.")  We likewise conclude that, under the federal law, the State of

Minnesota, its agencies, and its political subdivisions can enjoy the intellectual property rights of

the Federal Copyright Act.

---

[2] Most states claim copyright in their statutes, session laws, and other legislative materials. There
is case law support, however, for the proposition that the texts of statutes, rules and judicial
opinions are in the public domain.  See, e.g., Building Officials & Code Administrators v. Code
Technology, Inc., 628 F.2d 730 (1st Cir. 1980); see generally 1 M. Nimmer and D. Nimmer,
Copyright, § 5.06[C] (1993); Patterson and Joyce, Monopolizing the Law: The Scope of
Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L. Rev. 719
(1989).

State data practices and records management laws

Government agencies are, of course, creatures of statute and possess only those powers given to them by the legislature. As the Minnesota Supreme Court has made clear:

> The legislature states what the agency is to do and how it is to do it. While express statutory authority may not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature.

Peoples Natural Gas Co. v. Minnesota Public Utilities Commission, 369 N.W.2d 530 (Minn. 1985). Our review of the statutes leads us to the conclusion that the power to exercise and enforce intellectual property rights can be "fairly drawn" and is "fairly evident from the powers expressly given by the legislature."

For example, Minn. Stat. § 15.95, subd. 5(8) (1994) delegates to the government information access council the responsibility to evaluate "how the state and other governmental units can protect their intellectual property rights, while making government data available to the public as required in chapter 13." At bare minimum, that provision acknowledges the existence of those rights, and is inconsistent with the view that the legislature has already relinquished them outright. Likewise, Minn. Stat. § 16B.483 (1994), which provides that "[b]efore executing a contract or license agreement involving intellectual property developed or acquired by the state, a state agency shall seek review and comment from the attorney general on the terms and conditions of the contract or agreement," implies that the legislature understands that the state owns intellectual property and that agencies have the authority to enter into contracts or license agreements involving that property.

Other statutes expressly delegate to state agencies the authority and responsibility to preserve, transfer, sell and otherwise manage government records. Those statutes are all consistent with the idea that state agencies are to act as the responsible owners of certain government data. Minn. Stat. § 138.17, subd. 7 (1994) provides that "[i]t shall be the duty of the head of each state agency and the governing body of each county, municipality, and other subdivision of government to cooperate with the commissioner [of administration] . . . to establish and maintain an active, continuing program for the economical and efficient management of the records of each agency, county, municipality or other subdivision of government." The record retention statute, Minn. Stat. § 15.17, subd. 2 (1994) likewise creates a duty of "preservation and care" of government records in the chief administrative officer of each agency.

Minn. Stat. § 138.17, subd. 1c(3) (1994) gives the historical society, which is the ultimate depository for most state agency data, the authority to deny public access to "proprietary information, including computer programs and software and other types of information manufactured or marketed by persons under exclusive legal right, owned by the agency or entrusted to it." Minn. Stat. § 16B.51, subd. 3 (1994) provides that the commissioner of administration may sell, not just "certain data" or computer software, but rather:

> may sell official reports, documents, data, and publications of all kinds, may delegate their sale to state agencies, and may establish facilities for their sale within the department of administration and elsewhere within the state service.

Likewise, Minn. Stat. § 16B.52, subds. 1 and 2 (1994) seems to support state agencies' assertion of ownership of intellectual property, by providing that any "report or publication paid for from public funds must carry the imprimatur of the agency under whose authority it is

issued." Minn. Stat. § 16B.51, subd. 1 (1994) further provides that the commissioner of administration "shall supervise and control the making and distribution of all reports and other publications of all kinds issued by the state when not otherwise prescribed by law."

At minimum, those provisions delegate general management authority over government data and records to agencies, in conjunction with the commissioner of administration, and it is not unreasonable to construe that general authority to include the authority to take steps to preserve federal copyright ownership rights.

Section 201(d) of the Copyright Act does, however, provide that "[t]he ownership of a copyright may be transferred in whole or in part . . . by operation of law," and so, the question is whether the Minnesota Government Data Practices Act (MGDPA) transfers all or some of the State's exclusive rights with respect to "works of original authorship" to members of the public who seek access to the data or into the "public domain."

A fundamental principle of federal copyright law is that "[i]n order for the holder of a copyright to abandon his rights thereunder, he must perform some overt act which manifests an intent to surrender rights in the copyrighted material. Mere inaction or negative behavior will not suffice." Dodd, Mead & Co. v. Lilienthal, 514 F.Supp. 105, 108 (S.D.N.Y. 1981)(citations omitted).[3] If the question, then, is whether the state has expressly waived its right to exercise and

_____

[3] An analogous rule applies to the states' constitutional immunity from suit in federal court under the eleventh amendment, U.S. Const., amend. XI. States can waive their eleventh amendment immunity by state statute or constitutional provision, or by taking some other affirmative action in the context of a particular federal program, but the U.S. Supreme Court has insisted that, to be effective, the states' waiver of immunity be "unequivocal." See generally Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145 (1985); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907 (1984). No court would consider the absence of express state statutory authority to assert eleventh amendment immunity to constitute a state waiver of its federal constitutional right.

enforce its intellectual property rights under the FCA, the answer is clearly no. There are no

generally applicable state statutes expressly relinquishing federal intellectual property rights.

The MGDPA does give the public the right to inspect and copy public government data.

Minn. Stat. § 13.03, subd. 3 (1994) provides that:

> Upon request to a responsible authority or designee, a person shall be permitted to
> inspect and copy public government data at reasonable times and places, and,
> upon request, shall be informed of the data's meaning.

State agencies, therefore, may not rely on the FCA to deny citizens either an opportunity to

inspect or to copy public data.[4] In addition, the MGDPA also places restrictions on the amounts

that government agencies can charge for certain kinds of public government data:

> - When a request under this subdivision involves any person's receipt of copies or
>   public government data that has commercial value and is a substantial and discrete
>   portion of or an entire formula, pattern, compilation, program, device, method,
>   technique, process, database, or system developed with a significant expenditure
>   of public funds by the agency, the responsible authority may charge a reasonable
>   fee for the information in addition to the costs of making, certifying, and
>   compiling the copies. Any fee charged must be clearly demonstrated by the
>   agency to relate to the actual development costs of the information. The
>   responsible authority, upon the request of any person, shall provide sufficient
>   documentation to explain and justify the fee being charged.

---

[4] The Federal Copyright Act does contain a broad preemption provision, 17 U.S.C. § 301, and at
least one attorney general opinion has suggested that state agencies need not comply with state
open records laws if that would interfere with rights under the FCA. MW-307 Op. Atty. Gen.
Tex. 980 (1981) ("Moreover, the supremacy clause of the United States Constitution would
prohibit the custodian from following the Open Records Act where it conflicts with the copyright
law.") Our view is that nothing in the Supremacy Clause would prohibit a state from waiving or
relinquishing its rights as a copyright holder, if its legislature so decided. It therefore is
reasonable to conclude that a state legislature can forfeit any part of that federal "bundle of
rights" should it deem such waiver to be in the public interest. The state cannot forfeit those
rights on behalf of third parties, however, so state agencies who acquire "original works of
authorship" from third parties cannot be compelled by the MGDPA to violate federal
prohibitions on copyright infringement. To the extent then that compliance with the MGDPA
would compel an actual violation of the FCA, and subject the State to liability, the FCA controls.
See, e.g., Chavez v. Arte Publico Press, 59 F.3d 539 (5th Cir. 1995).

Id. Other statutes expressly authorize selling government data at market values, e.g., Minn. Stat. § 16B.405 (1994) (software developed by state agencies); Minn. Stat. § 116J.63 (1994) (reports, publications and related publicity and promotional material of the department of trade and economic development). Nevertheless, we do not believe the FCA provides state agencies with a basis to refuse to comply with the fee restrictions in Minn. Stat. § 13.03, subd. 3 (1994).

The focus of the MGDPA is, of course, on access, and it is mostly silent on subsequent use of government data. Accordingly, Minn. Rule § 1205.0300, subp. 2 (1993) provides that "the responsible authority shall provide access to public data to any person, without regard to the nature of that person's interest in the data," and does not govern subsequent use. It neither authorizes nor prohibits private commercial sales, further reproductions, noncommercial distributions, lending, displays, or the preparation of derivative works without attribution, or any of the other exclusive or nonexclusive rights set forth in the FCA. Requiring agencies to comply with the state access, copying, and fee charging provisions of the state law, while allowing them to use license or authorization agreements to enforce their other rights under the federal copyright law would therefore give effect to both statutes. See generally Minneapolis Star & Tribune Co. v. Housing and Redevelopment Authority, 310 Minn. 313, 324, 251 N.W.2d 620, 626 (1976) (harmonizing state open meeting law with statutory attorney-client privilege by allowing public agencies to close meetings with attorneys to discuss pending or imminent litigation).

The commissioner's opinion, however, concludes that the legislature that adopted the MGDPA decided, by implication, to thereby forfeit the state's federal copyright protections in "original works of authorship" involving public data. According to the commissioner, "[t]he

history of specific legislative authorizations to sell data or claim intellectual property rights indicates a legislative position that government entities do not have general authorization to make claim of intellectual property rights over public government data. If all government entities could claim intellectual property rights in their public data, then there would be no need for such specific authorizations to do so." Opinion 94-057, at 3.

In our view, that negative implication does not necessarily follow from the statutes cited. Minn. Stat. § 116P.10 (1994), which authorizes the environment and natural resources trust fund to share in receipts from copyrights to the extent of its share of the project's funding, does not address works authored by government agencies. To the extent, however, that that trust fund makes grants to state agencies (which it does), it arguably demonstrates a legislative assumption that those agencies may, under existing law, own copyrights in which the fund should share. Likewise, Minn. Stat. § 16B.51 (1994), which authorizes the commissioner to sell "official reports, documents, data, and publications of all kinds" and to delegate that authority to other state agencies, appears less like a "specific authorization" and more like a general authorization to take action consistent with the assertion of copyright ownership.[5] Minn. Stat. § 13.03, subd. 5 (1994) does clarify that "[n]othing in [the MGDPA] or any other statute shall be construed to prevent a state agency, statewide system, or political subdivision from acquiring a copyright or patent for a computer software program or components of a program created by that government

---

[5] Indeed, Minn. Stat. § 16B.41, subd. 2(f)(4) (1994) expressly directs the information policy office at the department of administration to establish "information sales systems that utilize licensing and royalty agreements to the greatest extent possible, together with procedures for agency denial of requests for licenses or royalty agreements by commercial users or resellers of the information."

agency." Since, under federal law, copyright "subsists" from the time a work is first embodied in

a tangible medium, 17 U.S.C. § 102 (1988), state law could not prevent a state agency from

"acquiring" a copyright in such data. The operative sentence in that subdivision is the second,

where it denies the public access to that data under the trade secret provisions in Minn. Stat.

§ 13.37 (1994). Without that provision, under our analysis, the government would have to

provide access and copying of that software, but could use a license or authorization to attempt to

impose restrictions on later use. The legislature presumably concluded that, to protect the state's

interest in generating computer software, it needed to impose additional restrictions on even

public access for inspection purposes. We do not deduce from that provision a legislative

intention to forfeit the state's rights as a copyright owner in all other public government data.[6]

The commissioner's opinion does raise important concerns about the impact intellectual

property claims may have on public access and use of public government data," Opinion 94-057,

at 4. We share that concern. We also believe, however, that it is important to understand that the

agencies' discretion over managing the use of their "original works of authorship" remains

subject to significant constraints. First of all, as previously explained, allowing state agencies to

assert the state's intellectual property rights would not limit the right of the public to access and

copy public data; the only potential limits would be on subsequent use of some of that data.

---

[6] We acknowledge that bills were introduced but not enacted in the 1994 legislative session
which would have expressly authorized agencies to "acquire" copyright protection. As the U.S.
Supreme Court has often cautioned, however, drawing positive inferences from legislative
inaction is risky. See, e.g., Cipollone v. Liggett Group, Inc., 504 U.S. ___, 112 S. Ct. 2608,
2619 (1992), quoting United States v. Price, 361 U.S. 304, 313, 80 S. Ct. 326, 330 (1960).
While the failure to enact proposed legislation can flow from a consensus of opposition to the
principles embodied therein, that is not necessarily the case. One might as easily conclude that
there are and have been a variety of opinions on intellectual property questions among those in
the state legislature who have confronted these issues.

Second, we do not construe the FCA to give state agencies general authority to exploit the commercial value of public government data beyond the recoupment of data development costs contemplated in Minn. Stat. § 13.03, subd. 3 (1994), unless otherwise specified in state statute.

Finally third, even a private copyright owner's "bundle of rights" is subject to a number of statutory exceptions, the most important of which is the so-called "fair use" doctrine. Under 17 U.S.C. § 107 (1988), a fair use such as "criticism, comment, news reporting, teaching, scholarship, or research" is not an infringement of the exclusive rights of a copyright owner. The courts are to consider four factors in determining whether a particular use is a "fair use" under the FCA:

1.      The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2.      The nature of the copyrighted work;

3.      The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4.      The effect of the use upon the potential market for or value of the copyrighted work.

Id. Pursuant to that statutory direction, the courts have adopted certain principles to guide future decisions. First of all, commercial use of copyrighted material is "presumptively" an infringement, and not a "fair use"; the "contrary presumption" applies to "noncommercial, nonprofit activity." Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 449, 104 S. Ct. 774, 792 (1984) (home videotaping). Second, the scope of "fair use" is greater for informational works than it is for more creative works. Stewart v. Abend, 110 S. Ct. 1750, 1769 (1990). Third, unpublished works are generally entitled to more protection than published ones, because

"first publication" is considered a core part of the copyright owner's "bundle of rights." Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 540, 105 S. Ct. 2218, 2220 (1985) (Nation's pre-publication printing of excerpts from Gerald Ford's memoirs held not to be a "fair use"). Therefore, although we believe, for example, that state agencies have the authority to use licensing or authorizing agreements to manage the subsequent sale or dissemination of taxpayer-funded data for commercial purposes, we see no basis for concluding that state agencies have any authority to use licensing or authorization agreements to protect themselves from criticism, comment, or news reporting, to stifle research, teaching, or scholarship, or to in any way restrict the "fair use" of public government data.

Our opinion, therefore, is that Mr. Boe had the right to inspect and copy the fish data as required by the MGDPA and to use the underlying facts as he deemed appropriate, but the State also had the legal authority to assert its rights under the FCA to manage the subsequent distribution and use of its "original work of authorship."

It is, of course, ultimately the legislature's role and responsibility to make or change policy in this area.[7] The management of the state's intellectual property raises a number of crucial policy issues: when to permit, when to encourage, and how to administer the commercial use or resale of government data; what principles should determine whether the taxpayers or the users of government information should bear the greater share of the costs of data generation and compilation; what kind of guidelines should state and local government agencies have to

---

[7] There are policy arguments for placing strict limits on agency assertion of intellectual property rights both to prevent potential abuse and to offer citizens a greater measure of clarity about their legal rights and responsibilities. See, e.g., Gellman, Twin Evils: Government Copyright and Copyright-Like Controls over Government Information, 45 Syracuse L. Rev. 999 (1995).

interpret concepts like "fair use"; and what impact will rapidly changing communications

technologies have on the public's need and interest in a broader range of government

information. We certainly encourage the legislature to consider these issues carefully.

Very truly yours,

HUBERT H. HUMPHREY III
Attorney General

KENNETH E. RASCHKE, JR.
Assistant Attorney General