# MINNEAPOLIS STAR AND TRIBUNE COMPANY AND OTHERS v. THE HOUSING AND REDEVELOPMENT AUTHORITY IN AND FOR THE CITY OF MINNEAPOLIS AND OTHERS.

251 N. W. 2d 620.

September 17, 1976—No. 46245.

*Faegre & Benson, John S. Holten, James M. Samples,* and *John B. Gordon,* for appellants.

*Holmes, Eustis, Kircher & Graven, David L. Graven,* and *James S. Holmes,* for respondents.

*Stanley G. Peskar,* for League of Minnesota Municipalities, amicus curiae, seeking affirmance.

314

SCOTT, JUSTICE.

Plaintiffs, Minneapolis Star and Tribune Company, Peter Ackerberg, and Leonard J. Canning, commenced this action to obtain a temporary and permanent injunction prohibiting defendant Housing and Redevelopment Authority (hereinafter HRA) and the individual defendants from conducting official meetings closed to the public. In addition, plaintiffs sought a declaratory judgment that all meetings of the HRA convened for the purpose of transacting public business be open to the public, and the imposition of civil penalties pursuant to Minn. St. 471.705, the Minnesota Open Meeting Law.

The motion for a temporary injunction was denied upon the lower court's finding that the Open Meeting Law was not inconsistent with nor did it repeal by implication the statutory attorney-client privilege. The court further held that the judicial branch of government has the inherent power to regulate the conduct of attorneys in coordination with public agencies. Plaintiffs appeal from the summary judgment entered in favor of defendants.

The HRA for the city of Minneapolis is a public agency responsible for the designation and distribution of Federal urban renewal funds throughout the city. Minn. St. 462.411 to 462.716. Defendants Richard H. Jefferson, Walter F. Bochnak, Emily Peake, and Donald P. Early are officers and members of the HRA. Defendants Clifford A. Carlson, Leo A. Bernat, and Mary Grace Flannery are members of the HRA, and defendant Richard A. Brustad is the executive director of HRA.

Plaintiff Minneapolis Star and Tribune Company publishes two daily newspapers, the Minneapolis Star and the Minneapolis Tribune. Plaintiff Peter Ackerberg is employed as a Minneapolis Star reporter, while Leonard J. Canning at the time of the commencement of the action served as the executive editor of the Minneapolis Star.

On April 23, 1975, plaintiff Ackerberg was present at the HRA

office to attend a scheduled and publicly announced special meeting. At that time he became aware of a session to be convened for the express purpose of discussing litigation strategy in an action then pending in the United States District Court, District of Minnesota, Fourth Division, entitled Cedar-Riverside Environmental Defense Fund v. Hills, 422 F. Supp. 294 (1976). HRA as a public agency and one of its members individually, Mr. Bochnak, are defendants in that action.

Ackerberg was excluded from this closed strategy session despite his stated objections that the meeting was to be conducted in violation of the Open Meeting Law. Upon conclusion of that meeting, Ackerberg was admitted to the previously scheduled public meeting.

The record also indicates that on March 3, 1975, HRA had conducted a similar closed strategy session concerning the Cedar-Riverside case without public notice of the meeting.

It is necessary to consider the basis of the HRA's decision to close the strategy meeting to the public. The Cedar-Riverside action concerns a challenge to the adequacy of the environmental impact statement prepared by the HRA in connection with the Cedar-Riverside high-density residential and commercial construction project in Minneapolis. Plaintiffs herein state in their brief that the plaintiffs in the Cedar-Riverside case assert that the HRA environmental impact statement failed to consider—

"* * * the effect of density on psychological and social behavior * * *; alleged excessive traffic congestion and associated air and noise pollution; lack of adequate natural parkland in the development plan; destruction of the nature of the existing community * * *; and the effect that funding a major development in one area of Minneapolis would have on denying redevelopment funds to other areas."

This pending action and its attendant circumstances precipitated the HRA's determination to meet to discuss the strategy to be employed throughout the litigation. As elucidated by the May 13, 1975, affidavit of James S. Holmes, attorney for HRA:

"3. That after motions were argued before Judge Miles Lord in United States District Court on April 21, 1975 regarding proceedings with the Cedar-Riverside environmental litigation, our office, as attorneys for the Authority, felt it imperative that we meet with our clients to discuss some of the questions that had been raised thereby and the alternatives available to us in that litigation. Accordingly, on April 23, 1975, Mr. Graven and I recommended a meeting with the Commissioners to discuss trial strategy and further recommend[ed] that said meeting be closed to the public and the press.

"4. That before said April 23 meeting, I explained to plaintiff Ackerberg the reasons for which we were recommending that he be excluded.

"5. That the meeting was then held and matters discussed related solely to Cedar-Riverside environmental litigation strategy.

"6. That as general counsel to the Housing Authority we have exercised extreme caution in the recommendation of or participation in closed meetings. This has been because of the ultimate remedy of 'ouster' which exists in the Minnesota Open Meeting Law. On April 29, 1975, we received an offer of settlement of the Cedar-Riverside environmental litigation from John Herman, attorney for the Cedar-Riverside Defense Fund. On May 6, 1975, a committee of the Housing Authority had on its meeting agenda this settlement offer. At the meeting, I advised the Commissioners of the offer, stated that it was my professional opinion that it would not be in the best interests of the Authority to discuss the settlement in the presence of the opposition, but stated that until the Open Meeting Law was clarified, I did not feel that I could recommend another closed meeting at that time. As a result, the Cedar-Riverside litigation item was removed from the agenda.

"7. That it is my opinion that our obligation as attorneys cannot be fulfilled unless we confidentially confer with our clients regarding this lawsuit. At the same time, it is our opinion that

it would be extremely detrimental to the Authority to discuss trial strategy and settlement proposals in the presence of our litigating opposition. Failure to recognize an attorney-client privilege in this and similar matters will have a significant negative impact upon the Authority's ability to effectively deal with litigation matters such as the Cedar-Riverside environmental suit."

Plaintiffs essentially assert that the legislature is empowered to limit the application of the attorney-client privilege when balanced with the extensive public interest and that the promulgation of the Open Meeting Law is exemplary of such a limitation. Minn. St. 471.705, subd. 1, provides in part:

"Except as otherwise expressly provided by statute, all meetings, including executive sessions, of any state agency, board, commission or department when required or permitted by law to transact public business in a meeting, and the governing body of any school district however organized, unorganized territory, county, city, town, or other public body, and of any committee, subcommittee, board, department or commission thereof, shall be open to the public, except meetings of the board of pardons, the Minnesota corrections authority."

In opposition, defendants contend that that portion of Minn. St. 471.705, subd. 1, which states "[e]xcept as otherwise expressly provided by statute" clearly preserves the integrity and applicability of the attorney-client privilege, as found in Minn. St. 595.02(2)[1] and Minn. St. 481.06(5).[2] While not specifically pro-

---

[1] Minn. St. 595.02(2) provides in part: "An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him or his advice given thereon in the course of professional duty * * *."

[2] Minn. St. 481.06(5) provides in pertinent part: "Every attorney at law shall:

* * * * *

"(5) Keep inviolate the confidences of his client * * *."

viding that attorney-client meetings involving public agencies must remain inviolate, both statutes generally indicate a legislative intent to preserve attorney-client confidences.

Our analysis must then focus upon the efficacy and necessity of adhering to the basic principles of the attorney-client privilege when balanced against the public's right to be informed of all actions and deliberations made in connection with activities geared to ultimately affect the public interest.

This court is empowered by Article 3, § 1, of the 1974 Minnesota Constitution to administer, among other areas, the practice of law. This section provides:

"The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution."

This duty and power were fully discussed in the recent decision of Sharood v. Hatfield, 296 Minn. 416, 425, 210 N. W. 2d 275, 280 (1973), in which we stated:

"The power to regulate the practice of law rests with the judiciary. Over 100 years ago, the United States Supreme Court, in a case arising from the Territory of Minnesota, said:

" '* * * [I]t has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed.' Ex Parte Secombe, 60 U. S. (19 How.) 9, 13, 15 L. Ed. 565 (1857).

"This court has recognized its inherent power to regulate the practice of law in many decisions. In the syllabus written by the court to the case of In re Petition for Integration of Bar of Minnesota, 216 Minn. 195, 12 N. W. 2d 515, 516, we said:

" '* * * [T]he power to make the necessary rules and regula-

tions governing the bar was intended to be vested exclusively in the supreme court, free from the dangers of encroachment either by the legislative or executive branches * * *.'"

Consistent with this pronouncement, this court has adopted a code of professional responsibility which includes among its many admonitions the following:

"CANON 4
*"A Lawyer Should Preserve the Confidences and Secrets of a Client*
"ETHICAL CONSIDERATIONS

"EC 4-1 Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance."

This long-accepted theory protecting the attorney-client relationship is as basic to our legal system as the right of the judiciary to regulate and oversee the administration of that legal system. That the legislature has recognized the court's power to so regulate is evidenced by Minn. St. 480.05, which provides:

"The supreme court shall have all the authority necessary for carrying into execution its judgments and determinations, and for the exercise of its jurisdiction as the supreme judicial tri-

bunal of the state, agreeable to the usages and principles of law. Such court shall prescribe, and from time to time may amend and modify, rules of practice therein and also rules governing the examination and admission to practice of attorneys at law and rules governing their conduct in the practice of their profession, and rules concerning the presentation, hearing, and determination of accusations against attorneys at law not inconsistent with law, and may provide for the publication thereof at the cost of the state."

In implementing this administrative power, it is imperative that we determine the proper place and scope of the attorney-client privilege within the system. Some jurisdictions have faced similar controversies to that presented herein.[3] Notable among the conclusions reached is that of a California Court of Appeals in Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors, 263 Cal. App. 2d 41, 58, 69 Cal. Rptr. 480, 492 (1968), where it was stated:

"The two enactments are capable of concurrent operation if the lawyer-client privilege is not overblown beyond its true dimensions. As a barrier to testimonial disclosure, the privilege tends to suppress relevant facts, hence is strictly construed.

---

[3] As of 1975, more than 40 states had open meeting laws. Little & Tompkins, *Open Government Laws: An Insider's View,* 53 N. C. L. Rev. 451, 487 to 89. Of those states, three (Missouri, North Carolina and Wisconsin) had open meeting laws that specifically provide for an attorney-client privilege. *Id.* at 457, note 19. Many commentators have proposed "model" open meeting laws. Kalil, *Florida Sunshine Law: Is Florida Sunshine The Most Powerful of Disinfectants?,* 49 Fla. B. J. 72, 79; Wickham, *Let The Sunshine In! Open-Meeting Legislation Can Be Our Key to Closed Doors in State and Local Government,* 68 Nw. U. L. Rev. 480, 499; Note, 49 Texas L. Rev. 764, 777; Note, *"Open Meeting Statutes: The Press Fights For The Right To Know,"* 75 Harv. L. Rev. 1199, 1220-21 (1962). Of them, only one has suggested a specific attorney-client privilege, with a mandatory public announcement of any subjects discussed and any actions taken immediately following any conference between a public agency and its attorneys. Little, *supra,* 485.

(*Greyhound Corp v. Superior Court, supra,* 56 Cal. 2d at p. 396 [15 Cal. Rptr. 90, 264 P. 2d 266].) As a barrier against public access to public affairs, it has precisely the same suppressing effect, hence here too must be strictly construed. As noted earlier, the assurance of private legal consultation is restricted to communications 'in confidence.' Private clients, relatively free of regulation, may set relatively wide limits on confidentiality. Public board members, sworn to uphold the law, may not arbitrarily or unnecessarily inflate confidentiality for the purpose of deflating the spread of the public meeting law. Neither the attorney's presence nor the happenstance of some kind of lawsuit may serve as the pretext for secret consultations whose revelation will not injure the public interest. To attempt a generalization embracing the occasions for genuine confidentiality would be rash."

In Florida, the privilege was recognized as an exception to that state's open meeting law in Bassett v. Braddock, 262 So. 2d 425, 428 (Fla. 1972); Times Publishing Co. v. Williams, 222 So. 2d 470, 475 (Fla. App. 1969). But see, Canney v. Board of Public Instruction of Alachua County, 278 So. 2d 260, 264 (Fla. 1973).

In Channel 10, Inc. v. Independent School Dist. No. 709, 298 Minn. 306, 215 N. W. 2d 814 (1974), we analyzed the need for recognizing a sweeping exception to the Minnesota Open Meeting Law, including instances in which a public body attempts to discuss pending litigation with its attorney without public notification or participation. While the circumstances of that case led to our hesitation to adopt either the majority rule favoring recognition of the exception or the minority rule (adopted in an Arkansas decision discussed hereinafter) refusing to recognize it, we noted that—

"* * * if any exceptions are to be made because of an attorney-client relationship, it should be done on a case-by-case basis or at least in a case with a more detailed factual setting * * *." 298 Minn. 323, 215 N. W. 2d 826.

Clearly the blind application of the attorney-client privilege in all such cases without guidelines or limitations would potentially jeopardize the public's right to be informed as required by the Open Meeting Law. Public matters should be discussed openly and freely, a position espoused by this court as well as the California court.

It must be noted that we have carefully considered the opinion of the Arkansas Supreme Court in Laman v. McCord, 245 Ark. 401, 432 S. W. 2d 753 (1968), which, on the ground the legislative mandate was clear, rejected the attorney-client privilege as an exception to the freedom of information statute. In a concurring opinion, Mr. Justice John Fogelman added (245 Ark. 408, 432 S. W. 2d 757) :

"* * * The statute [embodying the attorney-client privilege] not only protects the client from disclosure by the attorney, it also excuses the client from being compelled to disclose his confidential communications to his attorney or the advice given by the attorney. *Casey v. The State*, 37 Ark. 67.

"Only a small fraction of a city council's need for legal consultation and advice arises in connection with the preparation of cases for trial. Even in pending proceedings the need for confidential communciations on settlement possibilities and settlement authority is critical."

But he concluded that (245 Ark. 409, 432 S. W. 2d 757) :

"It is not our function to look into the wisdom of this action or the advisability of the public purpose sought to be accomplished."

We reject this analysis and prefer to adopt the reasoning of the trial court in its thorough memorandum which was incorporated into the order denying a temporary injunction:

"In conclusion, the two statutes are capable of compatible and concurrent operation assuming that the public officers and attorneys do not abuse their trust by extending the privilege as

a mere conduit to suppress public observation of the decision-making process. The 'in confidence' communication must not be arbitrarily or unreasonably exercised. Therefore, in holding that the Open Meeting Law does not impliedly repeal the attorney-client privilege as applied to the HRA's right to privately confer with counsel when it reasonably deems such conference requires confidentiality, the motion for a temporary injunction at this stage of the proceedings is accordingly overbroad. And, inasmuch as there has been no probative evidence evincing any other clandestine gathering or meeting by the HRA in contravention of the Open Meeting Law, the motion for temporary injunction should be denied."

In this area requiring a delicate balancing of public interests, our conclusion was reached only after a thorough consideration of the record, which discloses that the members of HRA were involved in active and immediate litigation in their capacity as members of a public agency and also, in one case, as an individual. The advisory meetings with the attorney were necessary to perhaps attain a settlement ultimately beneficial to the agency, the individual, and the general public.

The attorney-client exception is therefore operable in this matter to fully implement the confidentiality of the relationship. A basic understanding of the adversary system indicates that certain phases of litigation strategy may be impaired if every discussion is available for the benefit of opposing parties who may have as a purpose a private gain in contravention to the public need as construed by the agency.

The record discloses that tort cases against the HRA are handled by lawyers retained by insurance companies. Certainly, in this respect, if the board were required to meet with the insurance company's lawyer on a specific case, that consultation should not be subject to public scrutiny as an "open meeting" contemplated by the statute. The attorney-client exception discussed herein would almost never extend to the mere request for gener-

al legal advice or opinion by a public body in its capacity as a public agency. We cannot emphasize too strongly that should this exception be applied as a barrier against public access to public affairs, it will not be tolerated, for this court has consistently emphasized that respect for and adherence to the First Amendment is absolutely essential to the continuation of our democratic form of government. It will be upheld, however, if the balancing of these conflicting public policies dictates the need for absolute confidentiality. The exception is therefore available to satisfy the concerns expressed herein but is to be employed or invoked cautiously and seldom in situations other than in relation to threatened or pending litigation.

Affirmed.

MR. JUSTICE MACLAUGHLIN, after oral argument, withdrew from the consideration and decision of this case.

On November 4, 1976, the following order was filed:

ORDER

You will please take notice that on this date the following order was entered in the above entitled cause:

The appellants have petitioned for rehearing, and the same is opposed by the respondents. In their petition for rehearing the appellants do "not seek to question the central holding that the Minnesota Open Meeting Law, Minn. Stat. § 471.705, and the attorney-client privilege can be interpreted to operate compatibly and concurrently," but suggest that this court establish certain controlling procedures and standards. In such an extensive and important field the public would best be served by full hearings of all interested groups in determining proper parameters of governing rules. Courts do not possess the facilities for the necessary public expression in a single case such as this. An adequate solution should be attempted through diverse organizations such as Common Cause, The League of Municipalities, the Bar Associations, and the various interested media organizations.

ORDERED, that the petition for reargument herein be and the same hereby is denied and stay vacated.