PRIOR LAKE AMERICAN, a newspaper of Red Wing Publishing Company, Inc., Petitioner, Appellant,

v.

Wes MADER in his capacity as mayor of Prior Lake, et al., Respondents.

No. C7–00–1909.

Supreme Court of Minnesota.

May 2, 2002.

Mark R. Anfinson, Minneapolis, MN, for appellant.

George C. Hoff, Scott B. Landsman, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for respondents.

Randy Lebedoff, Minneapolis, MN, for amici curiae Minnesota Newspaper Assoc. and Associated Press.

Manuel Cervantes, City Attorney, Gerald T. Hendrickson, Asst. City Attorney, St. Paul, MN, for amicus curiae City of Saint Paul.

Barbara Berglund, Ely, MN, for amicus curiae Ely Area Citizens Concerned about Wastewater Treatment Affecting Shagawa and White Iron Lakes.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

## OPINION

LANCASTER, Justice.

The *Prior Lake American*, a newspaper published in Prior Lake, Minnesota, sued the Mayor of Prior Lake and three members of the Prior Lake City Council (respondents), claiming that they violated the Minnesota Open Meeting Law when they invoked the attorney-client privilege exception to close a Council meeting.[1] The district court granted respondents' motion for summary judgment, holding that respondents' need for confidential legal advice relating to a threat of litigation outweighed the public's right to access. The *Prior Lake American* appealed and the court of appeals affirmed. To determine whether the attorney-client privilege exception to the Open Meeting Law applies, we balance the purposes served by the attorney-client privilege against those served by the Open Meeting Law. The exception applies when this balancing dictates the need for absolute confidentiality. In this case, the balancing does not dictate the need for absolute confidentiality and, therefore, we reverse and remand.

The parties agree that there are no material facts in dispute. Ryan Contracting Co. (Ryan) applied for a conditional use permit (CUP) to operate a gravel extraction site in the City of Prior Lake (City). Ryan's application sparked concern from several sources, including the Shakopee Mdewakanton Sioux Community (SMSC), the Minnesota Department of Natural Resources, and the City. On January 18, 2000, Ryan sent a letter to the City that responded to several issues surrounding its application. The letter stated in part:

> In 1997–98 Ryan Contracting had secured an approved grading permit allowing the removal of material from this property. The City of Prior Lake revoked Ryan Contracting's approved grading permit while allowing an adjacent property owner and contractor to mine sand material from their property * * *. Ryan Contracting *suffered severe financial harm* as a result of the revocation of our approved grading permit. At this present time Ryan Contracting has voluntarily decided to comply with the City of Prior Lake's request to apply for a Conditional Use Permit. In the event Ryan Contracting is denied its CUP as allowed by City ordinance or an EAW is required, Ryan Contracting *will revise* its application to include any or all of the above items [set forth in preceding paragraphs]. Furthermore Ryan Contracting may seek legal action to ensure proper handling and compliance of this matter as well as legal action to recover lost revenues and/or costs incurred as a result of actions by the City of Prior Lake.

1. The complaint named Wes Mader in his capacity as Mayor of the City of Prior Lake and James Ericson, Michael Gundlach, and James Petersen, in their capacity as members of the Prior Lake City Council, as defendants.

The complaint did not name council member Pete Schenck, who opposed the meeting's closure and did not participate in the executive session, as a defendant.

The Council's first opportunity to consider Ryan's letter took place at its regularly scheduled February 7, 2000, meeting.

The February 7, 2000, meeting was open to the public. Council members Ericson, Gundlach, Petersen, and Schenck attended, as did Mayor Mader. Lee Ann Schutz, the editor of the *Prior Lake American,* also attended the meeting.

The Council's agenda included the following item: "Consider Approval of Report Regarding the Petition for Preparation of an Environmental Assessment Worksheet for Ryan Contracting's Application for a Conditional Use Permit for Gravel Excavation." The City's staff presented its findings and recommended that the petition for an environmental assessment worksheet[2] (EAW) be denied and that Ryan's CUP application be approved.[3]

A discussion of the staff's report followed. Although Mader acknowledged that the petitioner had not submitted facts to prove that Ryan's gravel excavation operation "would necessarily represent a risk to the water supply," he believed that the petitioner had submitted facts showing that Ryan's operation might pose a threat to the water supply. Mader continued, asking questions about the acreage that Ryan intended to mine, traffic concerns, and effects Ryan's operation would have on water resources. Mader concluded, "I'm not persuaded that * * * there isn't a potential environmental problem, nor * * * am I persuaded that this can be carried out without impact on neighboring properties, significant impact on neighboring properties."

Gundlach followed Mader. Gundlach asked about an observation well, traffic concerns, an aquifer, noise concerns, enforcement of conditions attached to Ryan's CUP, and tree replacement. Petersen spoke next. He believed that the Council should grant the petition for an EAW:

[T]he Mayor brought up a bunch of concerns that in denying this environmental assessment worksheet which I though[t] we were going to do here, and I just hardly can't go along with that at this point. There are too many concerns that got brought up on that and so I have to change my opinion on that a little bit. I think if we go anyplace on this we'll have to have that worksheet brought up. There are just too many things.

After Petersen's questions, Schenck asked about the timing and cost of an EAW, dewatering, cleaning, the length of time it would take Ryan to complete its gravel extraction, road maintenance, and property reclamation. Ericson then stated that "it would be prudent for us to conduct an EAW since there have been significant issues raised this evening."

Mader summarized his thoughts with respect to the petition for an EAW:

Let me again reiterate that I think there are some serious concerns [that] have been raised and I certainly am not comfortable, for example, that we've addressed the water issue carefully when our own documentation and the docu-

---

**2.** The record does not state who petitioned for an EAW. In a letter to the City dated October 7, 1999, the SMSC asked the City to require an EAW. In its January 18, 2000, letter, Ryan characterized the petition as "produced under the direction of the [SMSC]."

**3.** Consideration of whether to approve Ryan's CUP application was not on the agenda. The staff's recommendation to approve it sur-

prised Mader and Schenck. Schenck stated, "I wasn't prepared to talk CUP tonight * * *." Mader said, "I was looking primarily at the EAW issue as being the thing we were going to discuss, and I didn't discover until late today * * * that the resolution [to approve Ryan's CUP application] was also in [the staff's report]."

mentation from the DNR and from the Council are both suggesting we should have an EAW. Our own data, at least from what I understand now, we also indicate that site is also within the well head protection area of the well that the Dakota Community has[.] * * * [I]t should be an obvious[ ] conclusion that if State regulatory agencies are imposing well head protection for protection of water, I can't understand how we could possibly justify going ahead with an excavation operation within a well head protection area just because it doesn't happen to be our well. I think that would be inappropriate.

Mader addressed Ryan's letter:

I'm looking at * * * a letter to the City from Ryan Contracting * * * which says *"In the event Ryan Contracting is denied its CUP as allowed by City ordinance, or an EAW is required, Ryan Contracting will revise[ ] its application to include any or all of the above items."* Those are the items, incidentally, that have been previously determined to be objectionable * * *. The implication of that as I read it is "if you don't give us what we want, we['re] going to come back and add all those things that are so objectionable," and I really have some problems with that. But more important, the next sentence says, *"Ryan Contracting may seek legal action to ensure proper handling and compliance of this matter, as well as legal action to recover lost revenues and/or costs incurred as a result of actions by the City of Prior Lake."* Now, unless I don't understand what that means, I think what that says is "hey City Council, if you don't approve this tonight, we're going to sue you."

Mader then suggested that the Council retire to executive session:

I read this as a clear indication of a threat of litigation, and I am going to suggest to the rest of the Council members, that it is not inappropriate for the Council to meet in executive session to discuss any potential action that relates to potential litigation, and I'm not so sure that it wouldn't be very appropriate for the Council to recess and go into executive session so that we can discuss with counsel in an executive session just how we should view this threat of litigation relative to the actions that are before the Council this evening.

Gundlach made a motion to recess into executive session and Ericson seconded the motion. Schenck questioned the propriety of the meeting's closure:

[D]o we have enough here to legally retire into executive session? I know what this letter is getting at and we've got the CUP behind us, we require an EAW tonight, we move forward. There is no need for an executive session. Let them sue us.

Mader responded: "All I'm suggesting * * * is we do have the right to go into executive session when there is a threat of litigation, and I think this is a pretty clear threat. I assume you would agree[ ] with that?" Schenck disagreed, regarding Ryan's letter as "negotiation tactics, scare tactics." The Council passed the motion. Mader, Gundlach, Petersen, and Ericson voted in favor of the motion and Schenck voted against it. The Council adjourned to executive session. Schutz objected to the meeting's closure. Schenck did not participate in the executive session.

After the Council returned, the members explained why they retired to executive session. Mader said, "We went into executive session because of * * * the threat of litigation if we do not grant * * * the CUP petition and we do not deny the EAW." He reasoned:

I think it's certainly appropriate that as a Council deliberates and makes decisions, that it do so, hopefully without threat of litigation, but if there is a threat of litigation, the Council at least have an opportunity to hear from our counsel regarding what the implications of litigation would be and what the probability of litigation, that sort of thing. I think it'd be very imprudent for the Council to sit and make decisions without talking to its own counsel when there is implied litigation.

Gundlach "felt very strongly with that threat of lawsuit that we needed some counsel from our attorney." He acknowledged the constraints imposed by the Open Meeting Law:

> We are forbidden to discuss this stuff prior to the meeting * * * among each other due to the open meeting laws, and therefore, can only do it during a meeting either here in front of everyone, or in a closed session where we feel we have confidential information we have to discuss with our attorney as to what our liabilities are, and I felt very strongly about that.

Petersen explained, "I feel we need a little bit of help from counsel on this, so that's our reason for doing this." Ericson stated, "There [are] a lot of issues as far as litigation that we discussed in executive session, and I just wanted to make sure I had the benefit of our legal counsel before making any decisions on this." Mader summarized the events surrounding Ryan's application: "The history on the project, the correspondence and that sort of thing, I certainly interpret that if we do not respond the way the petition [Ryan's application for a CUP]

has asked, that the threat of litigation is imminent."

The Council unanimously passed a motion to direct the staff to prepare a resolution with specific findings of fact for requiring an EAW. On February 22, 2000, the Council adopted a resolution requiring an EAW.

In March 2000, the *Prior Lake American* commenced this litigation seeking a declaration that respondents violated the Open Meeting Law when they retired to executive session on February 7, 2000.[4] In October 2000, the district court denied the newspaper's motion for summary judgment and granted respondents' motion for summary judgment. In its Memorandum of Law, the district court stated:

> The Council demonstrated that there was a specific threat of litigation by a specific party, namely Ryan Contracting. Regardless of whether or not litigation was imminent, the Council needed advice from its attorney relating to that specific situation. Therefore, the type of advice sought by the Council rose above the level of mere general legal advice. Moreover, [respondents] have shown that the need to discuss the matter with the city attorney in confidence outweighed the public's right to access. Accordingly, the court concludes that [respondents] did not violate the open meeting law and that [respondents] are entitled to summary judgment * * *.

The court of appeals affirmed:

> In response to a threat from the contractor, respondents needed timely legal advice on specific acts and their consequences. That need justified the application of the exception. We agree with

---

4. The complaint also sought a declaration that respondents violated Minn.Stat. § 15.17, subd. 1 (2000), when they removed Schutz's objection to the meeting's closure from the

minutes of the February 7, 2000, meeting, and an order requiring respondents to restore the record of the objection. This claim is not before the court.

the district court that the attorney-client privilege exception was properly applied.

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from a summary judgment where there are no genuine issues of material fact, our review is limited to determining whether the district court erred in its application of the law. *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 298 (Minn.2000); *Metro. Prop. & Cas. Ins. Co. v. Metro. Transit Comm'n*, 538 N.W.2d 692, 695 (Minn.1995). We review de novo whether the district court erred in its application of the law. *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998); *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997).

■ The Minnesota Open Meeting Law was enacted in 1957. Act of Apr. 27, 1957, ch. 773, 1957 Minn. Laws 1043 (codified as amended at Minn.Stat. ch. 13D (2000)). It provides that "[a]ll meetings, including executive sessions, must be open to the public," including those "of the governing body of a statutory * * * city." Minn. Stat. § 13D.01, subd. 1(b)(4) (2000). Meetings may be closed under certain circumstances, however, including when "the closure is * * * permitted by the attorney-client privilege." Minn.Stat. § 13D.05, subd. 3(b) (2000); *see Minneapolis Star & Tribune Co. v. Hous. & Redev. Auth.*, 310 Minn. 313, 323, 251 N.W.2d 620, 625 (1976) (hereinafter *HRA*).

■ The Open Meeting Law serves several purposes:

(1) "to prohibit actions being taken at a secret meeting where it is impossible for the interested public to become fully informed concerning [public bodies'] decisions or to detect improper influences"; (2) "to assure the public's right to be informed"; and (3) "to afford the public an opportunity to present its views to the [public body]."

*St. Cloud Newspapers, Inc. v. Dist. 742 Cmty. Schs.*, 332 N.W.2d 1, 4 (Minn.1983) (citations omitted). These purposes are deeply rooted in the fundamental proposition that a well-informed populace is essential to the vitality of our democratic form of government.[5]

■ Because the Open Meeting Law was enacted for the public benefit, we construe it in favor of public access. *State by Archabal v. County of Hennepin*, 505 N.W.2d 294, 297 (Minn.1993); *see St. Cloud Newspapers*, 332 N.W.2d at 6 (stating that the Open Meeting Law "will be liberally construed in order to protect the public's right to full access to the decision-making process of public bodies"). "The few exceptions that exist are carefully restrained to avoid abuse." *Archabal*, 505 N.W.2d at 297; *see St. Cloud Newspapers*, 332 N.W.2d at 5 ("The Minnesota Legislature clearly intended that *all* meetings of public agencies be open, with rare and carefully restrained exception.").

From 1957 to 1990, the Open Meeting Law's text did not include an attorney-

---

5. "A popular Government, without popular information, or the means of acquiring it, is but a prologue to a farce or a tragedy; or, perhaps, both. Knowledge will forever govern ignorance; and a people who mean to be their own governors must arm themselves with the power which knowledge gives." Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 3 *Letters and Other Writings of James Madison* 276, 276 (Philadelphia, J.B. Lippincott & Co. 1865).

client privilege exception. *See* Minn.Stat. § 471.705 (1988).[6] In 1976, however, we recognized such an exception. *HRA*, 310 Minn. at 323, 251 N.W.2d at 625. In *HRA*, we confronted the conflict between "the basic principles of the attorney-client privilege" and "the public's right to be informed of all actions and deliberations made in connection with activities geared to ultimately affect the public interest." *Id.* at 318, 251 N.W.2d at 623. We recognized the exception "only after a thorough consideration of the record, which disclose[d] that the members of HRA were involved in active and immediate litigation." *Id.* at 323, 251 N.W.2d at 625.

In *HRA*, we grounded our analysis on the fact that the supreme court has the power to administer the practice of law. *Id.* at 318, 251 N.W.2d at 623. That power allowed us to determine the scope of the attorney-client privilege within the context of the Open Meeting Law. *HRA*, 310 Minn. at 320, 251 N.W.2d at 624. We described as "notable" a California case that faced a similar issue and quoted from it at length:

"The two enactments are capable of concurrent operation if the lawyer-client privilege is not overblown beyond its true dimensions. As a barrier to testimonial disclosure, the privilege tends to suppress relevant facts, hence is strictly construed. As a barrier against public access to public affairs, it has precisely the same suppressing effect, hence here too must be strictly construed. As noted earlier, the assurance of private legal consultation is restricted to communications 'in confidence.' Private clients, relatively free of regulation, may set relatively wide limits on confidentiality. Public board members, sworn to uphold the law, may not arbitrarily or unnecessarily inflate confidentiality for the purpose of deflating the spread of the public

meeting law. Neither the attorney's presence nor the happenstance of some kind of lawsuit may serve as the pretext for secret consultations whose revelation will not injure the public interest. To attempt a generalization embracing the occasions for genuine confidentiality would be rash."

*Id.* at 320–21, 251 N.W.2d at 624 (quoting *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal. App.2d 41, 69 Cal.Rptr. 480, 492 (1968) (citation omitted)). We emphasized the limited scope of the exception: "Clearly the blind application of the attorney-client privilege in all such cases without guidelines or limitations would potentially jeopardize the public's right to be informed as required by the Open Meeting Law. Public matters should be discussed openly and freely * * *." *HRA*, 310 Minn. at 322, 251 N.W.2d at 625. We cautioned against unfettered application of the exception:

The attorney-client exception discussed herein would almost never extend to the mere request for general legal advice or opinion by a public body in its capacity as a public agency. We cannot emphasize too strongly that should this exception be applied as a barrier against public access to public affairs, it will not be tolerated, for this court has consistently emphasized that respect for and adherence to the First Amendment is absolutely essential to the continuation of our democratic form of government. It will be upheld, however, if the balancing of these conflicting public policies dictates the need for absolute confidentiality. The exception is therefore available to satisfy the concerns expressed herein but is to be employed or invoked cautiously and seldom in situations other

---

**6.** The Open Meeting Law appeared at section 471.705 until a recent recodification.

than in relation to threatened or pending litigation.

*HRA,* 310 Minn. at 323–24, 251 N.W.2d at 626.

Almost fourteen years after we decided *HRA,* the legislature amended the Open Meeting Law to include an attorney-client privilege exception. Act of May 3, 1990, ch. 550, § 2, 1990 Minn. Laws 1517, 1519 (codified at Minn.Stat. § 13D.05, subd. 3(b)). Respondents and amici curiae note that the 1990 amendment adopted the attorney-client privilege exception without limitation. We therefore address what impact, if any, Minn.Stat. § 13D.05, subd. 3(b), has on the attorney-client privilege exception as set forth in *HRA.* We are mindful that "[w]e have occasionally permitted a statute to stand as a matter of comity, even where the legislature has encroached somewhat upon a judicial function, so long as the statute does not conflict with this court's inherent authority to make the final decision." *State by Humphrey v. Jim Lupient Oldsmobile Co.,* 509 N.W.2d 361, 363 (Minn.1993); *see Sharood v. Hatfield,* 296 Minn. 416, 424, 210 N.W.2d 275, 279 (1973) (noting that "this court has acquiesced in legislative acts prescribing administrative procedures for admission and discipline of attorneys as long as such acts did not usurp the right of the court to make the final decision").

■ The supreme court, as we have noted, has the inherent power to regulate the practice of law. *In re Zbiegien,* 433 N.W.2d 871, 874 (Minn.1988) (per curiam); *Sharood,* 296 Minn. at 425, 210 N.W.2d at 280. We exercised this power in *HRA* to establish the attorney-client privilege exception to the Open Meeting Law. "Words and phrases which have acquired an established meaning by judicial construction are deemed to be used in the same sense in a subsequent statute relating to the same subject matter." *Minn. Wood Specialties,*

*Inc. v. Mattson,* 274 N.W.2d 116, 119 (Minn.1978); *see State v. Gorman,* 546 N.W.2d 5, 8 (Minn.1996) (stating that prior judicial efforts to define a term may guide a court's interpretation of a statute). We do not discern any intent in Minn.Stat. § 13D.05, subd. 3(b), to change the exception from the one recognized by *HRA.* We therefore conclude that Minn.Stat. § 13D.05, subd. 3(b), is consistent with *HRA.* Pursuant to the rule of *HRA,* the attorney-client privilege exception to the Open Meeting Law applies when the balancing of the purposes served by the attorney-client privilege against those served by the Open Meeting Law dictates the need for absolute confidentiality. *HRA,* 310 Minn. at 324, 251 N.W.2d at 626.

■ Because the attorney-client privilege exception to the Open Meeting Law applies only when there is a need for absolute confidentiality, the scope of the privilege is narrower for public bodies than it is for private clients. The Restatement (Third) of the Law Governing Lawyers recognizes that an open meeting law may constrain a public body's attorney-client privilege:

A narrower privilege for governmental clients may be warranted by particular statutory formulations. Open-meeting and open-files statutes reflect a public policy against secrecy in many areas of governmental activity. Moreover, unlike persons in private life, a public agency or employee has no autonomous right of confidentiality in communications relating to governmental business.

*Id.* § 74 cmt. b (1998). The considerations recognized in the Restatement make sense to us. Although the attorney-client privilege is available both to public bodies and to private clients, public bodies are subject to the Open Meeting Law whereas private clients are not. The attorney-client privi-

lege is, therefore, available to public bodies as constrained by the Open Meeting Law.

Respondents rely on the final sentence of *HRA* to interpret the case as an adoption of a per se exception to the Open Meeting Law in cases of threatened or pending litigation. That sentence states: "The exception is therefore available to satisfy the concerns expressed herein but is to be employed or invoked cautiously and seldom in situations other than in relation to threatened or pending litigation." *HRA,* 310 Minn. at 324, 251 N.W.2d at 626. For the reasons set forth below, we reject respondents' interpretation.

First, respondents' interpretation amounts to a bright-line rule, but in *HRA* we rejected the notion that application of the attorney-client privilege exception to the Open Meeting Law is susceptible to bright-line rules. In fact, we said it would be "rash" to "attempt a generalization embracing" the circumstances in which the exception applies. *HRA,* 310 Minn. at 321, 251 N.W.2d at 624 (quoting *Sacramento Newspaper Guild,* 69 Cal.Rptr. at 492). Instead, we endorsed a case-by-case determination as to the exception's applicability. *Id.* at 324, 251 N.W.2d at 626. Further, in an order denying a rehearing, we refused to "establish certain controlling procedures and standards" for application of the exception. *Id.* at 324–25, 251 N.W.2d at 626. In short, we did not adopt bright-line rules as to the exception's applicability.

Second, the interpretation of the final sentence of *HRA* urged on us by respondents ignores its context. The preceding sentence endorses a balancing test: "[The attorney-client privilege exception] will be upheld, however, if the balancing of these conflicting public policies dictates the need for absolute confidentiality." *Id.* at 324, 251 N.W.2d at 626.

Third, the sentence itself does not state that the exception may always be invoked when litigation is threatened or pending. Instead, it says that the exception is to be invoked "cautiously and seldom in situations other than in relation to threatened or pending litigation." *Id.,* 251 N.W.2d at 626.

Finally, the fact of threatened litigation does not necessarily mean that a public body has "the need for absolute confidentiality" in its dealings with its counsel. The need for absolute confidentiality is the justification for closing an otherwise open meeting—that was our overriding message in *HRA.* For these reasons, we cannot agree with respondents' interpretation of *HRA.*

▄▄▄▄ Application of *HRA* to the instant case reveals that the district court erred in its application of the law. First, we analyze the purposes served by the attorney-client privilege in this case. We have described the attorney-client privilege by reference to its statutory formulation [7] and Wigmore's classic explication:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 John Henry Wigmore, *Evidence* § 2292, at 554 (1961), *quoted in Kobluk v. Univ. of Minn.,* 574 N.W.2d 436, 440 (Minn.1998). The attorney-client privilege exists " 'to

---

7. "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty * * *, without the client's consent." Minn.Stat. § 595.02, subd. 1(b) (2000).

encourage the client to confide openly and fully in his attorney without fear that the communications will be divulged and to enable the attorney to act more effectively on behalf of his client.'" *Kobluk,* 574 N.W.2d at 440 (quoting *Nat'l Texture Corp. v. Hymes,* 282 N.W.2d 890, 896 (Minn.1979)).

Here, the record does not reveal what respondents discussed in the closed meeting. Mader suggested that the Council adjourn to discuss Ryan's threat of litigation. When the Council returned, Mader reiterated that respondents closed the meeting because of Ryan's threat. Gundlach, Petersen, and Ericson echoed Mader's reasoning. We have no reason to doubt as a factual matter that respondents sought and received legal advice relating to Ryan's threat during the closed meeting. As a legal matter the attorney-client privilege exists to facilitate communications between those who seek and those who give legal advice. As we have said, though, the privilege is narrower in the context of the Open Meeting Law and so the analysis cannot end here.

We now turn our attention to the other side of the balance: the purposes served by the Open Meeting Law in this case. We are particularly concerned in the context of this case with "the public's right to be informed of all actions and deliberations made in connection with activities geared to ultimately affect the public interest." *HRA,* 310 Minn. at 318, 251 N.W.2d at 623. The Council had before it the question of whether to require an EAW. When the Council adjourned to executive session, it had not yet decided whether to require the EAW.

The factors that determine whether to require an EAW are detailed and specific. The assessment of litigation risks is not among them. An EAW shall be prepared if a project "may have the potential for significant environmental effects." Minn. R. 4410.1100, subp. 6 (2001). To determine whether a project has the potential for significant environmental effects, the following factors are considered: (1) "type, extent, and reversibility of environmental effects"; (2) "cumulative potential effects of related or anticipated future projects"; (3) "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority"; and (4) "the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer." Minn. R. 4410.1700, subp. 7 (2001). The Council did not need information regarding possible litigation with Ryan to determine whether Ryan's project may have the potential for significant environmental effects. If an appeal were to be taken from the Council's ultimate decision on the issue of whether to require an EAW, judicial review would be limited to determining whether the Council's action was unreasonable, arbitrary, or capricious, using the enumerated factors. *See Carl Bolander & Sons v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993). That analysis would not depend on "litigation risk." Thus, the Council arguably inserted an additional, and non-public, factor into its EAW decision.

■ The fact that Ryan's threat of litigation was worded partly in terms of "proper handling" of its application for a CUP can be construed simply as an expectation that land-use applicants have in every case—"proper handling." While Ryan might sue if the Council required an EAW, the denial of an EAW might lead another party, such as the SMSC, to sue. Given the contentious nature of many land-use proceedings, we are concerned about the ramifications of holding that open meetings may be closed to allow council mem-

bers to meet with an attorney about how to view a threat of litigation relating to a public matter that has yet to be decided. Such a holding might well eviscerate the Open Meeting Law. No doubt public bodies frequently face threats of litigation associated with their decisions.[8] Threats of litigation notwithstanding, the public has a right "to be informed of all actions and deliberations" that affect the public interest. Balancing the policies behind the attorney-client privilege and the Open Meeting Law, it is clear to us that when a public body is deciding a matter within its jurisdiction, the threat that litigation might be a consequence of deciding the matter one way or another does not, by itself, justify closing the meeting.

■ The attorney-client privilege exception to the Open Meeting Law applies when a public body seeks legal advice concerning litigation strategy. "A basic understanding of the adversary system indicates that certain phases of litigation strategy may be impaired if every discussion is available for the benefit of opposing parties who may have as a purpose a private gain in contravention to the public need as construed by the agency." *HRA*, 310 Minn. at 323, 251 N.W.2d at 625.

The record here is devoid of information about how, or whether, the private meeting would contribute to litigation strategy. Respondents did not identify, even in general terms, the type of information whose public disclosure would damage the City's position in future litigation with Ryan. In contrast, in *HRA* the record clearly showed that the Housing and Redevelopment Authority (HRA) held closed meetings with its attorney to discuss litigation strategy in a case then pending in the United States District Court. *Id.* at 315, 251 N.W.2d at 621. An affidavit submitted by the HRA's attorney revealed that the closed meetings were necessary to protect the HRA's litigation strategy and to discuss settlement proposals. The affidavit stated in part:

"3. That after motions were argued before Judge Miles Lord in United States District Court on April 21, 1975 regarding proceedings with the Cedar–Riverside environmental litigation, our office, as attorneys for the Authority, felt it imperative that we meet with our clients to discuss some of the questions that had been raised thereby and the alternatives available to us in that litiga-

---

**8.** A brief review of our opinions from the past several years reveals suits against cities arising out of a wide range of decisions. *See, e.g., Conlin v. City of Saint Paul*, 605 N.W.2d 396, 399 (Minn.2000) (motorcyclist injured in tipover alleges city was negligent in failing to inspect and maintain street, creating the hazardous condition, and failing to warn of the dangerous condition); *Johnson v. City of Eagan*, 584 N.W.2d 770, 771 (Minn.1998) (landowners challenge city-imposed lateral benefit water fee); *Country Joe, Inc. v. City of Eagan*, 560 N.W.2d 681, 682 (Minn.1997) (home building contractors challenge city's decision to impose road unit connection charge as a condition of issuance of building permits); *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 550 (Minn.1996) (property owner challenges city's revocation of rental dwelling license); *Wheeler v. City of Wayzata*, 533

N.W.2d 405, 405 (Minn.1995) (landowners seek declaration of the invalidity of city's zoning ordinances); *Knudtson v. City of Coates*, 519 N.W.2d 166, 167 (Minn.1994) (bar owner challenges constitutionality of city ordinances prohibiting nudity in licensed liquor establishments); *Carl Bolander & Sons*, 502 N.W.2d at 206 (after city council ordered preparation of an EAW, applicant seeks order requiring city to grant license without preparation of an EAW); *Krmpotich v. City of Duluth*, 483 N.W.2d 55, 55–56 (Minn.1992) (citizens group seeks declaratory judgment that retail project would violate Minnesota Environmental Rights Act if completed according to city council's rezoning); *Northpointe Plaza v. City of Rochester*, 465 N.W.2d 686, 686–87 (Minn. 1991) (property owner alleges violation of due process rights arising from city's refusal to grant conditional use permit).

tion. Accordingly, on April 23, 1975, [HRA's attorneys] recommended a meeting with the Commissioners to discuss trial strategy and further recommend[ed] that said meeting be closed to the public and the press.

"4. That before said April 23 meeting, I explained to plaintiff * * * the reasons for which we were recommending that he be excluded.

"5. That the meeting was then held and matters discussed related solely to Cedar–Riverside environmental litigation strategy.

"6. That as general counsel to the Housing Authority we have exercised extreme caution in the recommendation of or participation in closed meetings. This has been because of the ultimate remedy of 'ouster' which exists in the Minnesota Open Meeting Law. On April 29, 1975, we received an offer of settlement of the Cedar–Riverside environmental litigation from [an] attorney for the Cedar–Riverside Defense Fund. On May 6, 1975, a committee of the Housing Authority had on its meeting agenda this settlement offer. At the meeting, I advised the Commissioners of the offer, stated that it was my professional opinion that it would not be in the best interests of the Authority to discuss the settlement in the presence of the opposition, but stated that until the Open Meeting Law was clarified, I did not feel that I could recommend another closed meeting at that time. As a result, the Cedar–Riverside litigation item was removed from the agenda.

"7. That it is my opinion that our obligation as attorneys cannot be fulfilled unless we confidentially confer with our clients regarding this lawsuit. At the same time, it is our opinion that it would be extremely detrimental to the Authority to discuss trial strategy and settlement proposals in the presence of our litigating opposition. Failure to recognize an attorney-client privilege in this and similar matters will have a significant negative impact upon the Authority's ability to effectively deal with litigation matters such as the Cedar–Riverside environmental suit."

*HRA*, 310 Minn. at 316–17, 251 N.W.2d at 622. We recognized in *HRA* that "[t]he advisory meetings with the attorney were necessary to perhaps attain a settlement ultimately beneficial to the agency, the individual, and the general public." *Id.* at 323, 251 N.W.2d at 625.

■■■■ In avoiding bright-line rules as to timing, we have technically left open the possibility that the attorney-client privilege might legitimately be invoked before a substantive decision is made on the public issue before the public body. However, we note that invocation of the attorney-client privilege under such circumstances is fraught with peril. First, as we have emphasized today, the public has a right to be informed of all actions and deliberations made in connection with activities ultimately geared to affect the public interest. *Id.* at 318, 251 N.W.2d at 623. Moreover, the public's input and its knowledge of the bases for the decisions of its elected officials lie at the heart of a democratic government. Rooted in the separation of powers doctrine,[9] judicial review of

9. In *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977), we stated:
    We have consistently viewed with disfavor statutes which specify trials de novo and which attempt to confer original jurisdiction on trial courts over policy matters which are the responsibility of the legislative and executive branches. * * * We have repeatedly called attention to the danger of eroding the barriers which guarantee the separation of powers.

the decisions of public bodies is limited.[10] If a public body closes its deliberations to obtain confidential advice of counsel during the course of its work on a public issue, review of its ultimate decision for arbitrariness and capriciousness is nearly impossible [11] and the attorney-client exception could swallow the rule of public access.

The balancing of the policies served by the attorney-client privilege and the Open Meeting Law does not dictate the need for absolute confidentiality in this case. We hold, therefore, that respondents violated the Open Meeting Law when they closed the February 7, 2000, Council meeting. Because the lower courts found no such violation, they did not consider what remedies to impose, if any. Accordingly, we remand the case to the district court.

Reversed and remanded.

GILBERT, Justice (dissenting).

I respectfully dissent from the majority opinion. In light of the undisputed fact that there was a specific threat of litigation made by the developer of the property at issue, allowing a short time-out for the city officials to consult privately with the city attorney seems to be the most reasonable course of action. In a letter, Ryan Contracting Co. (Ryan) alleged severe financial harm as a result of the city's revocation of its gravel removal and grading permit. Ryan's letter went on to threaten legal action to recover lost revenues and/or costs if the city decided to either deny its request for a conditional use permit (CUP) or require an environmental assessment worksheet (EAW).

The council's first opportunity to consider Ryan's letter took place at its regularly scheduled meeting on February 7, 2000. At that meeting, there were two resolutions before the council: one to deny the EAW and one to approve the CUP. The council had tabled the CUP application at its prior meeting after it learned that the Environmental Quality Board had received a petition for an EAW and that no further action could be taken on the CUP until the council determined whether to require an EAW.

Ryan's threat of litigation related to the same project, the same development permit, and the same responsible government unit and involved environmental and non-environmental issues. The letter threatened specific legal action and was a direct, relevant, and material legal matter intertwined with the revocation of Ryan's 1997 and 1998 grading permits and its request for a CUP allowing gravel extraction on its property.

There is no allegation that Ryan's threat of litigation was frivolous. It is undisput-

---

**10.** In *Village of Edina v. Joseph*, 264 Minn. 84, 93, 119 N.W.2d 809, 815 (1962), we stated:

We have repeatedly said with respect to the decisions of municipal and other governmental bodies having the duty of making decisions involving judgment and discretion that it is not the province of the court to substitute its judgment for that of the body making such a decision, but merely to determine whether that body was within its jurisdiction, was not mistaken as to the applicable law, and did not act arbitrarily, oppressively, or unreasonably, and to determine whether the evidence could reasonably support or justify the determination.

**11.** Reliance on factors that the legislature did not intend a public body to consider renders the body's decision arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Reliance on secret advice thwarts review of whether the decision is arbitrary and capricious because the court cannot determine what the public body considered.

ed that the district court found that there was a specific threat of litigation and that the council needed advice from its attorney relating to that specific situation. The district court held that this type of advice rose above the level of mere general legal advice, that the mayor and council members demonstrated a need to discuss the matter with the city attorney in confidence, and that this need outweighed the public's right to access. Minnesota statutes and our precedent allow for the closure of public meetings when permitted by the attorney-client privilege. Minn.Stat. § 13D.05, subd. 3(b) (2000); *Minneapolis Star & Tribune Co. v. Hous. & Redev. Auth.*, 310 Minn. 313, 323, 251 N.W.2d 620, 625 (1976). The majority opinion wrongfully singles out one reason for open meetings—"the fundamental proposition that a well-informed populace is essential to the vitality of our democratic form of government"—but then ignores both the facts of this case and the equally compelling fundamental proposition that, in a democratic society, citizens should be encouraged to participate in governmental functions as elected officials. When there is a real threat of litigation relating to their decisions, they should be allowed to seek legal counsel. This fundamental proposition is particularly compelling when, as here, the threatened litigation includes claims for damages against the city itself and potential statutory liability for individual council members.

Our citizen taxpayers expect their city council members to be prudent in exercising their judgment. When faced with a specific threat of litigation, it is prudent for a city council to seek timely advice from its counsel. Without legal advice, the council may fail to take proper legal considerations into account in making its decision and unwittingly expose its taxpayer constituents to potentially millions of dollars of damages.

This case does not come close to representing the blind application of the attorney-client privilege to all cases. The record demonstrates that the privilege was invoked only in response to a specific, written threat of litigation that included a claim for damages. This minimal intrusion on the principle of open meetings is the responsible reaction to an increasingly litigious society in which city councils are brought into court on a regular basis to defend themselves and/or pay damages for wrongful conduct.

I submit that when there is a bona fide threat of specific litigation, there is also a corresponding need to recognize the importance of timely and confidential attorney-client communications between public servants and their counsel. The majority opinion fails to deal with the facts of this case, which are uncontested with respect to the written threat of specific litigation. Although the majority purports to discard a bright-line rule in favor of a case-by-case approach, it in fact adopts a bright-line rule that applies irrespective of the specific facts of the case. Under the majority's analysis, the threat of litigation would never justify a public body's decision to close a public meeting to obtain confidential legal advice from its attorney. This case presents one of the rare situations in which we must balance the public policy of favoring open meetings against the need for absolute confidentiality. Furthermore, there is no basis for discounting or ignoring the threat of litigation in this analysis. In fact, we have declined to make a distinction between threatened and pending litigation in the past. *See Minneapolis Star & Tribune Co.,* 310 Minn. at 324, 251 N.W.2d at 626. The record in the case at bar reflects that the only item that prompted the closed session with counsel was the threat of litigation.

In support of its decision, the majority attempts to isolate the EAW decision from other actions impacting Ryan's project, i.e., the grading and extraction permit and the CUP. The majority states that "[t]he factors that determine whether to require an EAW are detailed and specific. The assessment of litigation risks is not among them." However, in this case, the city had already issued a grading permit for the property at issue and then summarily revoked the permit. The EAW was considered only in the context of Ryan's CUP application and the validity of the city's revocation of Ryan's grading permit. Indeed, these other decisions directly impact the EAW as to the type, extent, and reversibility of any environmental effects and the cumulative potential effects of related or anticipated future projects, such as the site that was being graded immediately adjacent to Ryan's property. The majority then concludes that "[t]he Council did not need information regarding possible litigation with Ryan to determine whether Ryan's project may have the potential for significant environmental effects." The majority's great concern with the open meeting principle throws out of balance the ramifications of disallowing an attorney-client privilege exception to the Open Meeting Law. Such an exception would allow the council to close its meeting to discuss how to assess a collaterally related threat of litigation arising from the grading permit revocation and the CUP. Moreover, our citizens expect more of their elected officials and the attorneys who advise them when they are faced with a specific threat of litigation. Importantly, all of these matters—including the grading permit, the CUP, and the EAW—were within the city's jurisdiction. We should not splice out segments of these governmental actions and review them in isolation, but rather look to the context of the whole picture. Furthermore, contrary to the majority's assertion, the fact that the threatened litigation is contingent upon a public matter pending before the council should have no bearing on this analysis.

In a practical sense, the majority either forces a city council to proceed with their business and avoid discussing the threatened litigation or, alternatively, to conduct a public discussion of the threatened litigation with their city attorney in an open meeting. Such a discussion would force the city attorney to become a witness in any litigation that ensues. It may also require the city to seek outside counsel because of the conflict that is created when the city attorney becomes a material witness in the litigation. See Minn. R. Prof. Conduct 3.7 (stating the general rule that a "lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness"). Having closed sessions with an attorney to discuss settlement or ultimate strategy involving actual litigation is obviously not the sole purpose of having confidential communications with an attorney. The attorney's advice can also be used in anticipation of litigation and in mitigation of potential damages. The availability of confidential advice from an attorney to a representative of a public body assists the making of informed decisions and prevents legal mistakes. Such advice should be deemed by this court to be appropriate preventive legal medicine that justifies the invocation of the attorney-client privilege.

The majority remands this case to the district court, commenting that "because the lower courts found no such violation [of the Open Meeting Law], they did not consider what remedy to impose, if any." The potential consequences of intentionally violating the Open Meeting Law are serious. In this case, the city council obviously intended to close its meeting to the public to discuss with its attorney the ramifications of the threatened litigation in the

context of this very complex land development situation. The record also reflects that the council was fully aware of the Open Meeting Law. One council member voted against the closure and, in addition, a member of the media challenged the closure. Upon remand now, the district court may have to consider whether to assess a civil penalty of up to $300 against the individual council members, "which may not be paid by the public body." Minn.Stat. § 13D.06, subd. 1 (2000). An action to enforce this penalty may be brought by "any person." *Id.*, subd. 2. Moreover, if an individual intentionally violates the Open Meeting Law on three or more occasions, the individual must forfeit his or her office. *Id.*, subd. 3. In addition to other remedies, the court may award reasonable costs, disbursements, and reasonable attorney fees up to $13,000 to any party. *Id.*, subd. 4. Although the city "may pay any costs, disbursements, or attorney fees incurred by or awarded against any of its [city council] members," *id.*, subd. 4(c), it is not required to do so. It is true that these monetary penalties and attorney fees can be awarded against a council member only if the court finds that there was a specific intent to violate the Open Meeting Law. *Id.*, subd. 4(c). Yet this rule does not remove the possibility that council members will have to individually defend themselves and incur personal liability if the city chooses not to indemnify them. The city may also incur further costs in defending such actions and then paying out an ultimate award. The taxpayers again may end up footing the bill on these additional costs and expenses. Could there be a closed meeting to discuss possible disposition of these further claims? Or would that discussion have to take place in a public meeting?

Anything short of affirming the decision of the lower courts will jeopardize our citizens' trust and confidence in the decisions under consideration by public bodies and may even discourage our citizens from serving in an elected capacity. This service is essential in our democratic form of government. Finally, if a mistake is made and the city unknowingly or unwittingly makes a legal blunder because of its inability to consult with its attorney in private, the taxpayers are the ones who really lose. The balance needed in our system compels allowing our city officials to meet and discuss a specific threat of litigation in confidence with their attorney. We have thousands of public bodies meeting throughout the state on a regular basis.[1] These entities are dealing with ever-more complex issues that often end up in court. We must be mindful of exposing our individual city council members and public bodies to damages and the enormous costs of defending such litigation. A short recess to consider preventative legal remedies provides the proper balance to these important, competing public interests when there is a bona fide threat of litigation.

1. There are 87 counties, 854 cities, and 1,792 townships in Minnesota.